CHARLES M. DICKSON v. J. J. STRICKLAND, SECRETARY OF STATE ET AL.

No. 4215.   Decided October 18, 1924.

(265 S. W., 1012.)

1.—Constitutional Law—Powers of Legislature—Qualifications for Office.

The qualifications for public office, when defined by the Constitution, are as clearly beyond change by the Legislature as are the qualifications of electors when fixed by constitutional provision. Solon v. State, 5 Texas Crim. App., 301; Koy v. Schneider, 110 Texas, 378. (Pp. 188-190).

2.—Same—State Executive Officers.

The Constitution having committed to the Legislature the power to determine the eligibility of all elective state officers of the executive department, it was beyond the power of the Legislature to authorize the courts to keep the name of a candidate for governor possessed of every constitutional requirement off any election ballot, regardless of whether he possessed the additional qualifications specified in Article 3082, Revised Statutes. (Pp. 188-190).

3.—Same.

Though the illegality of such added requirements be disregarded, sections 1 and 3 of article 4 require a legislative adjudication of the constitutional eligibility of the Governor, which may be determined only by the two houses of the Legislature in joint session. This delegation of power could not be rendered nugatory by the action of other tribunals. (Pp. 190-197).

4.—Political or Judicial Question.

The power to decide the result of an election for Governor, including the eligibility of the candidate, is a political, not a judicial, question, embracing the entire process till the result is declared and every justiciable issue in the contest, of law or of fact. The power conferred on the Legislature to determine it would be rendered impotent if, in advance of its action, it might be bound by the determination of a court in which it had no part. Its decision was beyond judicial control, and could not be conferred on any

tribunal other than the Legislature in joint session. City of Dallas v. Consolidated St. Ry. Co., 105 Texas, 341. (Pp. 190-197).

**5.—Same.**

The general grant of jurisdiction in law and equity conferred on district courts (Const. art. 5, Sec. 8) can not prevail over the specific terms conferring power to determine election of state officers on the Legislature. (Const. art. 4, sec. 3). (Pp. 191-194).

**6.—Case Distinguished—Certified Questions.**

The decision in Ferguson v. Maddox, ante p., ——, is distinguished as limited to the specific question certified, which did not involve the trial court's jurisdiction or the validity of articles 3082, 3083, and 3083a, Revised Statutes. This court, in answering certified questions, makes no determination, by implication or otherwise, with respect to anything save the precise questions answered, and enters no judgment thereon. Moreover the question here involved could not have arisen in that case, which concerned only a primary election on which article 4, section 3, of the Constitution has no bearing. (P. 196).

**7.—Election—Qualification—Right to Maintain Suit.**

A private citizen, having no interest in the matter save as one of the general public, could not, unless by virtue of a valid statute authorizing it, maintain suit in the District Court to prevent the name of a disqualified candidate being placed on the ticket at an election. San Antonio v. Strumberg, 70 Texas, 366; Staples v. State, 112 Texas, 68, followed. (Pp. 196, 197).

**8.—Right to Hold Office—Right to Choose Officer.**

The basis of the right to hold office is the right of the electors to choose whom they will, if not constitutionally disqualified therefor, to fill it. Eligibility belongs not exclusively to electors enjoying the right of suffrage, but to all persons not excluded by the Constitution. Steusoff v. State. 80 Texas, 430. With the ultimate political sovereignty placed in the people courts would be careful in examining any restriction placed on their power of choice. The history of constitutional restrictions in Texas based on sex is reviewed. (Pp. 197-205).

**9.—Qualifications for Governor—Sex—Coverture—Constitution.**

The Constitution, (art. 4, sec. 4) defines the affirmative qualifications for the office of Governor. But neither this nor the sections negativing qualification (art. 12, Sec. 9, art. 13, sec. 3) are based on sex or coverture. (Pp. 198-200).

**10.—Same—He and His.**

The use of the words he and his in article 4, section 4, of the Constitution, in defining the qualifications of the Governor, implies no limitation as to sex. No English word in the singular number includes both he and she in meaning. The same word in the Constitution is supposed to be used throughout in the same sense; and obviously he includes she in article 1, section 10. And article 16, section 48, continuing former laws in force, preserved article 5502 Revised Statutes declaring that "the masculine gender shall include the feminine and neuter", which was a general rule of construction where no contrary intention appeared from the context. (Pp. 200, 201).

**11.—Public Office—Eligibility—Married Women.**

The disabilities imposed by coverture at common law and their progressive relaxation are considered; but it is held that the common law as to marital rights was never in force in Texas, nor the individuality of the

114 Tex. Sup.—12.

wife here merged in that of the husband. And such rule is held not in accordance with the customs of its people and existing conditions. (Pp. 201-205).

### 12.—Women—Eligibility to Office at Common Law.

An examination of the authorities and of history shows that while women have been held incompetent to fill certain positions, there was no fixed rule of common law in England against the eligibility of woman or of a married woman to hold office; and there is such conflict in the decisions of American states as to justify the court in following the juster rule. (Pp. 201-205).

### 13.—Same—Removal of Disqualification as Electors.

Decisions generally are in accord that the removal of disqualification of woman as electors also removes existing disqualification to hold office. (P. 205).

### 14.—Married Woman—Right to Hold Office—Impeachment and Disqualification of Husband.

The impeachment and removal from office of a Governor and his disqualification thereby to hold office did not operate to disqualify his wife from thereafter being elected to the same position. The penalty for his misconduct could not be imposed on other members of his family. (Pp. 205, 206).

### 15.—Same—Subterfuge.

Evidence considered is held not sufficient to establish as matter of law that the candidacy of the wife of an impeached Governor for election to that office was a mere subterfuge to enable him in her name to fill a position for which he was disqualified by the judgment pronounced on his impeachment. (P. 206).

Questions certified from the Court of Civil Appeals for the Third District, in an appeal from Travis County.

*I. W. Stephens,* for appellant.

The Common Law of England, as declared by the courts of last resort in the several states of the Union, was adopted in Texas in 1840, and continued in force in 1876 by Sec. 48, Art. 16 of the Constitution of 1876; and it was the rule of the Common Law as thus declared in Texas that women were ineligible to the office of Governor of any State or Territory, no woman having ever held such office from the time whereof the memory of man runneth not to the contrary; it being an office which had always been filled by a man and one which involved the exercise of chief executive functions, both civil and military, and the highest order of judgment and discretion, and which could not be filled by a deputy, and which was in no sense ministerial. The nature and character of the duties of the office of Governor and their due performance are incompatible with their performance by women and particularly by married women. Mecham on Public Offices, sec. 73; Throop on Public Officers, secs. 68-70; 22 Ruling Case Law, 406, 407; Robinson Case, 131 Mass., 376; State v. Davidson, 92 Tenn., 531; Ex Parte Griffin, 71 S. W., 746; State v. Hodges, 154 S. W., 506; Opinion of Justices, 150 Mass., 586; Opinion of Justices, (N. H.) 62 Atl., 969, 5 L. R. A. (NS) 415; Attorney

General v. Abbott, (Mich) 80 N. W., 372; Opinion of Justices, 73 N. H., 621; Opinion of Justices (N. H.) 99 Atl., 999; In Re Bardwell, 55 Illinois, 535; Schuchardt v. People, 99 Ill., 501, 39 Am. Rep., 34; In re Goodell, 39 Wis., 232, 20 Am. Rep., 42; In re Maddox 55 L. R. A., 298, 93 Md., 727; Hardreader v. State, 33 S. W., 117; Delaney v. State, 90 S. W., 642; State v. De Armigo, 140 Pac., 1123.

The Common Law, adopted in 1840, was kept in force as the law of Texas by the express provisions of Sec. 48, Art. 16 of the Constitution of 1876. The Language of that Constitution prescribing the qualifications and duties of Governor is to be construed in the light of the Common Law so adopted and kept in force, and with reference to the acts of the Legislature existing at the time of its adoption. Hewitt v. State, 25 Texas, 722; Gordon v. State, 43 Texas, 330; Ex Parte King, 35 Texas, 658; Henderson v. Beaton, 52 Texas, 29; Collins v. Tracy, 36 Texas, 546; R. C. L. Vol. 25, pages 1052-3-4.

The intention of the framers of the Constitution may be ascertained by considering the facts and circumstances under which it was adopted. Chambers v. Fisk, 22 Texas, 504; Grigsby v. Peak, 57 Texas, 142; State v. McAlister, 88 Texas, 284; Commission v. Houston, 90 Texas, 340; Harris County v. Stewart, 91 Texas, 133; Houston v. State, 95 Texas, 507; Brown v. Galveston, 97 Texas, 1.

The fundamental rule is to give effect to the intention of the people who adopted it. Cox v. Robison, 105 Texas, 426.

The meaning of the Constitution is fixed when it is adopted and is not different at any subsequent time. Cox v. Robinson, 105 Texas, 426.

Justice Stayton in Zeliff v. Jennings, 61 Texas, 470, speaking of the effect of the Common Law on the relations of husband and wife, uses this language: "Under that law they are deemed one person; and the husband is liable to the same measure of pecuniary responsibility for the torts of the wife as though the acts were his own".

Under Const., Article 4, in which the office of Governor is referred to, the masculine pronoun is invariably and repeatedly used. The rule of interpretation which authorizes the substitution of the feminine for the masculine has no application here, because when that rule is invoked it is for the purpose of carrying out the intention of the instrument to be interpreted. It is never used to change the evident purpose and intention of such instrument.

As further evidence that the framers of the Constitution did not intend to include a married woman in prescribing the qualifications for the office of Governor, in Sec. 5 of Art. 4, they included within the compensation which he was to receive for his services the use and occupation of the Governor's mansion, fixtures and furniture, and in Sec. 13 required him to reside at the seat of Government, except

when by the act of the Legislature he might be required or authorized to reside elsewhere. These provisions are wholly incompatible with the idea of a married woman being Governor, since under the Law of Texas, as it then existed and still exists, a married woman cannot control the place of her residence, but must conform in this respect to the will of her husband, who has the power to fix her residence.

As further evidence that the framers of the Constitution intended that only a man should hold the office of Governor, in Sec. 7, he was made Commander in Chief of the Military forces of the State. The duties imposed on the Governor by this and subsequent Sections of Art. 4 were in many instances such as to render their performance by a woman, and particularly a married woman, unreasonable, if not impossible.

The amendment to Sec. 2, Art. 6 of our State Constitution, confers on females as well as males, subject to certain disqualifications, the right to vote; but like the Federal Amendment, does not even purport to confer any other right. "The only subject in contemplation was the right of suffrage". Harper v. State, 234 S. W., 909; Fremont v. State, 259 S. W., 583; State v. James, 114 Atl., 553; Opinion of Justices, 130 N. E., 685; Opinion of Justices, 135 N. E. 173; State v. Walker 192 Iowa, 823, 185 N. W., 619; State v. Mittle, 120 S. C., 526, 113 S. E., 335; State v. Bray 153 La., 103, 95 So., 417.

The rule of decision clearly deducible from the authorities is this: That the suffrage amendment, whether of the Federal or a State Constitution, or both, does not confer on women the right to sit on juries and to hold public office, but that such right, where it exists, arises under some other constitutional or statutory provision already in existence when the suffrage amendment is adopted or which is thereafter enacted.

The political status of the wife follows that of her husband. See Speer on Law of Married Women, page 98, sec. 76.

The framers of the Constitution adopted in 1876, who were presumptively acquainted with the history of the gubernatorial office, and with the laws of Texas, could hardly have contemplated that the time would ever come when the Constitution they framed could be so construed as to authorize a wife who is under coverture of an impeached Governor to herself become Governor when he could not, and thus by reason of the marital relation share with him the administration, fees and emoluments of the office of Governor, including the occupancy of the mansion, furniture and fixtures provided for the governor.

*Chas. M. Dickson*, appellant, in pro. per., filed argument and citation of authorities on the question certified.

*W. A. Keeling*, Attorney-General, and *Jno. C. Wall* and *L. C. Sutton*, Assistants, for appellee Strickland, Secy. of State, filed argument and cited authorities in support of the following propositions. 1. Mrs. Ferguson being a citizen, a voter, an inhabitant and one of the people, the presumption is that she is eligible to the office of Governor in the absence of a clear and unmistakable law to the contrary. 2. The Constitution itself furnishes the rule of law that she is eligible to the office, since it prescribes both affirmatively and negatively the qualifications of the Governor, which are exclusive, indicating clearly also its intention by excluding women from other political privileges while failing to do so as to the office of Governor. 3. From a history of the matter and the authorities, it is doubtful whether there ever was a settled rule at Common Law against women's competency to hold public office. The authorities are conflicting, past practice is against it, and the rule has not been accepted by what seems to us the weight of authority. A doubtful rule will not overcome the presumption in favor of eligibility. 4. The rule, whether ever settled or not, is no longer the rule, the reasons having disappeared. 5. The supposed ancient rule of ineligibility is unsuited and inapplicable to our conditions and circumstances. 6. The American cases are almost evenly divided on the question, with the weight of authority in reason and logic, if not numerically, in favor of women's eligibility. 7. If it has been supposed that the enfranchisement of negroes gives them the right to hold office, a similar situation exists as to women. 8. The practical, contemporaneous and departmental construction is in favor of women's competency to hold office. 9. All the authorities since the granting of suffrage to women hold that women are eligible to public office, and this in States formerly holding to the contrary.

*Ocie Speer*, for Mrs. Miriam A. Ferguson appellee.

As Mrs. Ferguson's eligibility is affected by her marriage, the Common Law has nothing to do with the question, because the Common Law as it affects the marital relations has never been in force in Texas. Cartwright v. Hollis, 5 Texas, 152; Wallace v. Burden, 17 Texas, 467; Bradshaw v. Mayfield, 18 Texas, 21; Burr v. Wilson, 18 Texas, 367-368; Barrett v. Kelly, 31 Texas, 476; George v. Stevens, 31 Texas, 673; Barkley v. Dumke, 87 S. W., 1147.

Whatever influence the Common Law justly has upon the interpretation of our Constitution and laws, that Common Law is not the Common Law of England as it existed in England at any time but rather as it existed in these United States at the time of our adoption of it. Grigsby v. Reib, 153 S. W., 1124.

This provision as to the qualifications for governor is introduced by the masculine pronoun "he" from which it may be suggested

that it was intended the governor should be a male. But it is a rule of construction of statutes and constitutions that the masculine gender includes the feminine, the use being generic and broad. Crow v. Hostetter, (Mo.) 39 S. W., 270; Speer's Marital Rights, Sec. 75. To hold otherwise would be to do violence to the evident purpose and intention of the framers. Bill of Rights, secs., 3, 6, 8, 10, 13.

But "governor" is no more masculine in form than "he", "him", and "his" are masculine. Indeed, under a most common sense interpretation the words "testator" and "father" in our probate statutes, have been held to include a "testatrix" and "mother". Parker v. Swain, 223 S. W., 231.

There is nothing in our Constitution or Statutes, defining marital rights, that in any way incapacitates a married woman from acting in any representative capacity for another. She may be the agent for her husband and as such agent her acts are governed by the general rules applicable to principal and agent. Southern v. Hunt, 141 S. W., 359. And she may likewise be the agent and representative of a third person and in so far as the business of her principal and the interest of third persons dealing with her are concerned, she can do all things necessary the same as if she were unmarried. Fielder v. Smith, 151 S. W., 605; Richburg v. Sherwood, 102 S. W., 905; Wetzel v. Simon, 28 S. W., 274. She may therefore act as a trustee in an expressed or implied trust. Holman v. Oil Co., 152 S. W., 885. She is not incapacitated to act as guardian. Wright v. Wright, 155 S. W., 1015. On the contrary she is given by statute the preference of the guardianship of her minor child or children of a former marriage. So too, the right of a married woman to be an executrix or administratrix is recognized in Nichelson v. Ingram, 24 Texas, 630. Indeed, this is statutory. See also Sections 284 to 289, Speer's Law of Marital Rights.

There is nothing in our marital laws requiring the husband to assent to or join in any contract or conveyance whatsoever which the wife might be called upon to make in the execution of her duties as agent, trustee, guardian, executor or any other representative capacity whatever. See Speer's Law of Marital Rights, Section 232. There is no duty imposed by law upon the governor of Texas that cannot be performed by a married woman without the assent or joinder of her husband. These pertain only to contracts and conveyances affecting the wife's property, and it cannot be conceived how the inability of the wife to convey her separate property without the joinder of her husband, or her inability to make a contract binding upon herself or property, can in any event affect any duty she would owe the State as its governor.

*Jno. C. Wall,* assistant Attorney-General, also filed separate argument and citation of authorities for appellee.

Mr. Justice GREENWOOD delivered the opinion of the court.

Certified Questions from the Honorable Court of Civil Appeals of the Third Supreme Judicial District of Texas, in an appeal from the District Court of Travis County, 53rd Judicial District.

This case is before the Supreme Court on a certificate from the Honorable Court of Civil Appeals reading as follows:

"The above styled and numbered cause is pending in this court on appeal from the District Court of Travis County, 53rd Judicial District. The questions herein certified are material to a decision of the appeal and grow out of the nature and result of the suit and the facts disclosed by the record before us, which, in so far as deemed material to this certificate are the following:

Charles M. Dickson, a resident citizen and legal voter and property taxpayer in the County of Bexar, State of Texas, brought the suit 'as provided for in Articles 3082, 3083 and 3083-a of the Revised Civil Statutes of Texas, and as otherwise provided by law' against Mrs. Miriam A. Ferguson and her husband James E. Ferguson, J. J. Strickland, Secretary of State of Texas, and the County Judge, County Clerk and Sheriff of each of the counties of Texas, as members of the election board in such counties, for a temporary injunction restraining them from placing or causing to be placed the name of Mrs. Miriam A. Ferguson as a candidate for governor on the official ballot to be used in the general election to be held in the several counties in Texas on the 4th day of November, 1924, and to contest her right to hold the office of governor under the Constitution and laws of Texas.

"Plaintiff's petition alleged and the admitted facts show the following:

"That on September 25, 1917, the defendant Mrs. Miriam A. Ferguson was, has been ever since, and is the wife of the defendant James E. Ferguson; that on September 25, 1917, the Senate of Texas, sitting as a court of impeachment for the trial of said James E. Ferguson, who was then governor of Texas, on certain charges preferred by the House of Representatives, adjudged and decreed that he be removed from the office of governor of Texas, and thereafter be disqualified to hold any office of honor, trust or profit under the State of Texas;

"That thereafter said James E. Ferguson announced himself as a candidate for the office of governor to be voted on at the Democratic primary election ordered to take place on Saturday, July 26, 1924; but at the suit of one Jno. F. Maddox, a voter and citizen of Texas,

he was enjoined from having his name placed on the ticket at said primary election by the District Court of Harris County, Texas; which judgment was affirmed by the Court of Civil Appeals for the First Supreme Judicial District of Texas, upon answers by the Supreme Court to questions certified in said cause by said Court of Civil Appeals;

"That thereafter the name of the said Mrs. Miriam A. Ferguson was placed on the ballot used at the primary elections held on July 26, 1924, and August 23, 1924, at which primary elections she received a majority of the votes cast for nomination for the office of governor, and in consequence thereof she received the Democratic nomination for governor on September 3, 1924, from the Democratic Convention of Texas, which assembled in Austin on September 2, 1924; and on September 3, 1924, the Chairman and Secretary of said convention delivered to the acting Secretary of State of Texas a certificate containing the names of those nominated by said convention, which said list of names including the name of said Mrs. Miriam A. Ferguson was certified and transmitted by said acting Secretary of State to the County Judge of each county in the State of Texas; and the list of names, including that of Mrs. Miriam A. Ferguson, to be placed upon the official ballot for the approaching November election is now in the hands of the several judges of the State of Texas, or will be in due course of mail, and unless restrained from doing so the county clerks of the several counties in Texas will cause the name of said Mrs. Miriam A. Ferguson to be placed on the official ballot as the Democratic candidate for governor of Texas, and unless restrained from doing so the official ballot containing her name as said candidate will be placed in the hands of the officers and judges of said November election by the election board of each county.

"It is contended in the petition that Mrs. Miriam A. Ferguson is ineligible to hold the office of governor, (1) because she is a woman; (2) because she is a married woman; and (3) because she is the wife of James E. Ferguson, who stands impeached and thereby disqualified to hold any office of honor, trust or profit under the State of Texas.

"As a further cause of ineligibility to the office of governor on the part of Mrs. Miriam A. Ferguson, the petition, after setting forth the facts with reference to the impeachment and the injunction proceeding against James E. Ferguson, alleges:

" 'And thereupon the said James E. Ferguson, as your petitioner is informed, believes and charges, caused the name of his wife to be placed on the ballot at said primary election as a candidate for Governor in pursuance of an understanding, as your petitioner is informed, believes and charges, between the said James E. Ferguson and his wife, that by this means the said James E. Ferguson would

become a candidate in the name of his wife for the Democratic nomination for the office of Governor, and that if said nomination was obtained in the name of his wife then the said James E. Ferguson would be the Democratic nominee for Governor of Texas in the name of his wife, and be elected Governor of Texas in the name of his wife, and if elected in the November election the said James E. Ferguson would be the real Governor and the said Mrs. Miriam A. Ferguson merely a figurehead or Governor in name only; and that in pursuance of this understanding her name as candidate for the Democratic nomination for Governor was again placed on the ballot to be used at the primary election held August 23, 1924.'

" 'Wherefore, your petitioner charges that the said James E. Ferguson is the real candidate for Governor, using his wife's name, with her consent, for the purpose of circumventing and evading the force and effect of the impeachment decree disqualifying him from acting as Governor or becoming a candidate therefor.'

"The defendant Mrs. Miriam A. Ferguson in reply to the allegations in the last two quotations from plaintiff's petition, pleaded the following denial:

" 'In this connection this defendant specially denies that the defendant James E. Ferguson caused this defendant's name to be placed on the ballot at the said primary election as a candidate for Governor, or that he caused her name to be so placed on said ballot in pursuance of any understanding, either express or implied, that by so doing the said James E. Ferguson would become a candidate in the name of this defendant or with any understanding or agreement that if said nomination was obtained the said James E. Ferguson would be the nominee for Governor in the name of this defendant, or with any understanding or agreement that if she was elected at the November election the said James E. Ferguson would be the real Governor and this defendant a mere figure-head, or Governor in name only. 'This defendant further specially denies that the said James E. Ferguson is the real candidate for Governor or that he is using this defendant's name with her consent for the purpose of circumventing or evading the force and the effect of the impeachment decree referred to in the plaintiff's petition. And this defendant further specially denies that if she is elected to the office of Governor that the said James E. Ferguson will become the real Governor of Texas, as is alleged in plaintiff's petition, and denies that in the event of her election she will become only nominally the Governor of said state. This defendant further alleges in that connection that she became a candidate for the Democratic nomination for the office of Governor upon her own volition and without any understanding or agreement, either express or implied, with her husband, James E. Ferguson, or anyone else, that in the event of

her nomination and election the said James E. Ferguson would hold or administer the office of Governor or that he would be the real Governor and she a mere figure-head. That this defendant in the event of her election to the office of Governor will hold and administer said office in her individual capacity as is required by the oath of office which she will take, and that her election will not result in the said James E. Ferguson becoming either nominally or actually the Governor of Texas, or controlling or administering the affairs of said office.'

"This pleading was adopted by defendant James E. Ferguson,

"In reply to this denial, the plaintiff pleaded two articles which appeared in the Ferguson Forum during the campaign in which Mrs. Ferguson received the Democratic nomination for governor, and a circular to the voters in said campaign, signed by Mrs. Miriam A. Ferguson. It was admitted by the defendants that these two published articles were issued by authority of defendants, James E. Ferguson and Mrs. Miriam A. Ferguson, and that this circular was issued by authority of Mrs. Miriam A. Ferguson; and all parties agreed that the two articles and the circular might be considered in evidence at the hearing, which was done. These two articles and circular are attached to this certificate, marked, respectively Exhibits A, B, and C.

"Three answers were filed in the case, one by Mrs. Miriam A. Ferguson, another by James E. Ferguson, and the third by the remaining defendants in the case. Each of these answers contains a general demurrer and a number of special exceptions which raise specifically the following issues or contentions:

"1. That plaintiff has not sufficient interest in the suit or the result sought to be accomplished hereby to entitle him to maintain the action, or have preliminary injunction issued at his instance, as prayed for in his petition.

"2. That Article 3083-a of the Revised Civil Statutes of Texas, under which the suit was brought, is, in so far as it attempts to vest in a private individual the right or authority to institute or maintain this suit, in conflict with Section 21 of Article V and Section 21 of Article IV of the Constitution of this State, and is therefore void and furnishes no authority for the institution or maintenance of this suit.

"3. That the court was without jurisdiction to determine the issues presented in the petition, or grant the relief prayed for because the rights asserted by plaintiff and sought to be protected by this suit are political and not legal rights; and further because by the Constitution of this State the Legislature is vested with exclusive authority to canvass the returns of the election of all executive officers of the State to determine the eligibility of those voted on for such

officers, and all questions relating to the contest of the election of any person to the office of governor, or any other office of the executive department of the government; and this suit in its nature and effect is an effort by judicial decree to interfere with the authority vested by the Constitution in the legislative department of the government, and to forestall and prevent the free exercise of the authority and jurisdiction of the Legislature to determine the eligibility of the defendant for the office of governor, or any contest of her election based upon any question as to her eligibility to hold said office.

"All the pleadings filed in the case were verified by the respective parties.

"The application for temporary injunction, after due notice to the parties, was heard by the District Court sitting in chambers, on the 22nd day of September, 1924, upon bill and answer and admissions of the parties; and on the 29th day of September, 1924, the District Court rendered the following judgment:

"'All the special exceptions of all the defendants are overruled, and all the exceptions of the plaintiff are overruled, to which action of the court exception was taken by the respective parties. Thereupon the court finds that the plaintiff was entitled to bring this suit under articles of the statutes alleged in his petition and that the court has jurisdiction of the suit, but the court being of opinion that the plaintiff's pleadings state no cause of action, finds that the plaintiff is not entitled, on the pleadings and evidence set out above, to the injunction prayed for, and it is ordered that the application for said injunction be overruled and that said injunction be denied and refused, to which action of the court the plaintiff then and there excepted and gave notice of appeal to the Court of Civil Appeals for the Third Supreme Judicial District of Texas, at Austin.'

"Plaintiff has duly perfected his appeal, and the cause is now pending thereon in this court.

"Because of the public importance of the controversy thus raised and the evident necessity of having a judicial determination thereof as soon as practicable, we deem it advisable to certify for your decision the following questions:

"1. Did the District Court err in holding that it had jurisdiction to entertain this suit and adjudicate the eligibility of Mrs. Miriam A. Ferguson to the office of governor of this State and her right to have her name printed upon the official ballot as a candidate for that office in the general election to be held in November 1924?

"2. Did the District Court err in holding that the plaintiff, Charles M. Dickson, had a sufficient interest and right to bring this suit, he being a resident citizen, a legal voter and property taxpayer in Bexar County, Texas, and bringing the suit in such capacity only?

''3. Is Mrs. Miriam A. Ferguson ineligible to the office of governor of this State by virtue of her sex?

''4. Is Mrs. Miriam A. Ferguson ineligible to the office of governor of this State by virtue of her status as a married woman?

''5. Is Mrs Miriam A. Ferguson ineligible to the office of governor of this State by virtue of her status as the wife of James E. Ferguson who stands impeached and disqualified from holding office in Texas?

''6. Does the record as stated establish as a matter of law plaintiff's theory that James E. Ferguson is the real candidate for governor and that his wife's name is being used by him as a subterfuge to evade the force and effect of the impeachment decree; and, if so, is Mrs. Miriam A. Ferguson, therefore, ineligible to the office of governor of this state?''

The certificate embodies copies of the articles from ''The Ferguson Forum'' and the campaign circular, which are mentioned in the certificate. The contents of these writings will be stated, as far as is necessary, in answering the sixth certified question.

It is appellant's contention that the District Court had jurisdiction of his suit and that a negative answer· should be given to the first question certified, for the two reasons: first, because article 3083a of the Complete Texas Statutes expressly authorized the District Court to hear and determine his action; and, second, because the recent decision of this court in Maddox v. Ferguson, 263 S. W., 888, was warranted only in the event article 3083a is a valid statute.

The statute does plainly attempt to confer jurisdiction on the District Court, at the instance of a voter who need have no special interest, to prevent the name of any ineligible candidate for a state office or for any other office in Texas from appearing on the ballot in any general, special or primary election. If, therefore, the statute be valid as applied to a suit contesting the eligibility of a candidate for governor at a general election, it will suffice to sustain the jurisdiction of the District Court. The grave inquiry we are required to solve is: Was it within the constitutional power of the Legislature to enact the statute, in so far as it applies to a general election for the office of governor of Texas?

Article 3083a is an amendment of an act approved April 20th, 1895, entitled ''An act to better define who are eligible for the several state and county officers of the State of Texas'', which provided that no person should be eligible to any state or county office in Texas unless he had resided in the State for twelve months and in the county in which he offered himself as a candidate for six months next preceding the election, and should have been an actual bona fide citizen of such county for more than six months. The act further forbade the issuance by any county judge of any certificate of election to any person unless he possessed the stated qualifications.

Chapter 56, Acts 1895, 10 Gammel's Laws of Texas, p. 811. In so far as this act related to officers, such as the governor, whose qualifications had been particularly and carefully and differently enumerated in the Constitution, it cannot be doubted that it was utterly void.

Ruling Case Law says: "Where the constitution declares the qualifications for office it is not within the power of the Legislature to change or add to these unless the Constitution gives that power." 9 R. C. L., 1124.

The Supreme Court of Illinois concluded a careful examination into the power of the Legislature to require an officer to have a further residence qualification than as specified in the Constitution of that State by saying:

"In our judgment, when the Constitution undertakes to prescribe qualifications for office its declaration is conclusive of the whole matter, whether in affirmative or in negative form. Eligibility to office belongs to all persons. In our Constitution no other form of stating eligibility to office is found than the declaration that no person shall be eligible who does not possess certain qualifications. The Constitution of the United States is in the same form in this particular, and so are the constitutions of other State. The expression of the disabilities specified exclude others. The declaration in the Constitution that certain persons are not eligible to office implies that all other persons are eligible." People v. McCormick, 261 Ill., 413, Ann. Cas., 1915A, 342.

The Supreme Court of Minnesota announced the same rule in the late case of Hoffman v. Downs, 145 Minn., 465, 177 N. W., 670. Many cases to the same effect are cited in note 3 at page 99 of Cooley's Constitutional Limitations (7th Ed.).

The qualifications of public officers, when defined by the Constitution, are as clearly beyond change by the Legislature as are the qualifications of electors when fixed by constitutional provision. It is the declared law by both the Court of Criminal Appeals and the Supreme Court of this state that it is beyond the power of the Legislature to add an additional qualification for an elector to those prescribed by the Constitution. Solon v. State, 5 Tex. Crim. App., 261, 114 S. W., 349; Koy v. Schneider, 110 Texas, 378.

The Act of 1895 was amended by the Act approved February 19th, 1919, being Chapter 13 of the General Laws passed by the 36th Legislature, and again by the Act approved July 25th, 1919, correcting verbal inaccuracies in the first amendment, being Chapter 40 of the General Laws of the 2nd Called Session of the 36th Legislature. As amended, the statutes are numbered 3082, 3083, and 3083a, in the Complete Texas Statutes.

By its express terms, article 3082 undertakes to provide that no person shall be eligible to *any* state, county, precinct or municipal office in Texas, unless, in addition to the qualifications required under the Constitution, he shall also have resided in the State for twelve months, and in the county, precinct or municipality in which he offers himself as a candidate, for six months next preceding the election, and shall also have been an actual, bona fide citizen of said county, precinct or municipality for more than six months. Articles 3082 and 3083 undertake to forbid the placing of the name of any ineligibile candidate, as previously defined, on any ballot at any general, special, or primary election, and to forbid the issuance to such ineligible candidate of any certificate of election. Article 3083a declares the District Court shall have jurisdiction and authority to enforce articles 3082 and 3083, at the suit of any interested party or of any voter. Enough has been said to establish the invalidity of the requirement of article 3082 that the candidate for governor at general elections must have resided more than six months in a certain county, precinct, or city, and must have been a *bona fide* citizen thereof. The Constitution definitely states the governor's qualifications as to residence. It requires no more in that respect than he "shall have resided *in this State* at least five years immediately preceding his election." So, it was utterly beyond the power of the Legislature to authorize the courts to keep the name of a candidate for governor off any election ballot, when possessed of every constitutional qualification, regardless of whether he possessed the additional qualifications specified in article 3082.

The articles are not considered free of constitutional infirmity though we assumed that we should disregard or eliminate the portions seeking to illegally add to the requirements of the Constitution as to qualifications for office in this State.

Section 1 of article IV of the Constitution provides that the executive department of the state shall consist of a governor, a lieutenant-governor, secretary of state, comptroller of public accounts, treasurer, commissioner of the general land office, and attorney general. Section 2 of Article IV requires the election of these officers, except the secretary of state, by the qualified voters of the state at the time and places of election for members of the Legislature.

Section 3 of Article IV reads:

"The returns of every election for said executive officers, until otherwise provided by law, shall be made out, sealed up, and transmitted by the returning officers prescribed by law, to the seat of government, directed to the secretary of state, who shall deliver the same to the speaker of the house of representatives, as soon as the speaker shall be chosen; and the said speaker shall, during the first

week of the session of the legislature, open and publish them in the presence of both houses of the legislature. The persons voted for at said election, having the highest number of votes for each of said offices respectively, and being constitutionally eligible, shall be declared by the speaker, under sanction of the legislature, to be elected to said office. But if two or more persons shall have the highest and an equal number of votes for either of said offices, one of them shall be immediately chosen for such office by joint vote of both houses of the legislature. Contested elections for either of said offices shall be determined by both houses of the legislature in joint session.''

Other provisions of the Constitution explicitly state what renders one eligible to be governor, as well as what renders one ineligible.

No one can be induced into the office of governor without a legislative determination of his election. Not only must the Legislature determine that he received the highest number of votes, but Section 3 of Article IV requires a legislative adjudication of his constitutional eligibility. Should the election be contested on the ground of lack of constitutional eligibility, or on any other ground, such contest may be determined only by both houses of the Legislature in joint session.

The Constitution, having committed to the Legislature, and withheld from the judiciary, the power to determine the eligibility of all elective state officers of the executive department, such power of determination must be exercised by the Legislature and could not be granted away to the courts, at least in so far as the attempted grant pertains to the general election whose result is to be declared only under sanction of the Legislature, after inquiry into the constitutional qualifications of the person found to have received the highest number of votes.

The court has not been favored with written arguments on the certified questions as to the jurisdiction of the trial court. The contentions advanced by appellant's distinguished counsel in oral argument may be briefly summarized as follows: First, that the power of the Legislature does not come into exercise until after the election, leaving the courts unhampered until the time comes for the Legislature to receive the returns of the election and declare its result and determine contests; second, that the power of the Legislature does not extend to the determination of questions purely of law; and, third, that authority was granted the Legislature to empower the district court to enforce articles 3082 and 3083 by the final clause of amended Section 8 of Article V of the Constitution, providing that the District Court shall have ''general original jurisdiction over all causes of action whatever for which a remedy or jurisdiction is not provided by law or this Constitution, and such

other jurisdiction, original and appellate, as may be provided by law." We will carefully consider each of these contentions.

It is plain that the Constitution intended the Legislature to be the tribunal to decide: First, as to whether a person claiming the office of governor was constitutionally eligible; and, second, as to whether such person received the highest number of legal votes. It could not be meant for this supremely important delegation of power to be rendered nugatory by the action of other tribunals; yet the Legislature would be rendered impotent if in advance of its action it might be bound by a determination in which it could have no part. This court has consistently drawn the distinction between the power to decide the result of an election—a political question— and the power to decide the right to hold an office after election,—a judicial question. To say that the courts should take jurisdiction only before the election, out of which property rights spring, would be to impute to the makers of the Constitution a wholly unreasonable purpose to leave to the courts the consideration of questions always regarded as political and to bring the legislative power into play only after the questions became judicial.

Judge Gould spoke for the court in Wright v. Fawcett, 42 Texas, 206, in saying: "It is true that the District Court has jurisdiction, as has often been held, to try the right to an office. * * * To decide the result of an election is a question of different character. 'part of the process of political organization, and not a question of private right.' (Huselman v. Rems, 41 Penn. St. Reps., 396; and see Arbury v. Beavers, 6 Texas, 469, and Baker v. Chisholm, 3 Texas, 157; Walker v. Tarrant Co., 20 Texas, 16.) Where the law has provided a mode of deciding cases of contested elections, designed to be final, the courts have no authority to adjudicate such cases, other than that the law may give to them." If it is the Constitution which provides that a nonjudicial tribunal shall settle such cases, the decision thereof by such tribunal is beyond judicial control, unless plainly authorized by the Constitution itself.

The court observed in Seay v. Hunt, 55 Texas, 558. that on principle and authority the question of eligibility to office was to be regarded as a question of a political nature, and that it was "one which the public welfare demands should be promptly decided previous to the induction into office of the party elected."

In City of Dallas v. Consolidated St. Ry. Co., 105 Texas, 341, 342, 148 S. W., 294, the court said:

"As elections are essentially the exercise of political power, it cannot be doubted that all action properly related thereto and necessary to their completion is from the same source, and is but the expression of the same power. The canvassing of the returns of

an election is necessary to the determination of the result; it is an integral part of the election itself, without which the election is a vain proceeding, and as such inheres as a right sanctioned by the political power, as absolute as the right of the electorate to vote or for the election to be held. When it is declared that because of their relation to the political power of the government, elections are beyond the control of the judicial power, it is meant that the whole election, including every step and proceeding necessary to its completion, is exempt from judicial interference; and the canvassing of the returns of an election must therefore be held as within the rule and justly entitled to its protection.''

The Supreme Court of Arkansas construed a section of the constitution of that state directing the president of the senate to open and publish returns of every election for certain executive officers, including the governor, in the presence of the members of the legislature, and providing that ''the person having the highest number of votes shall be declared elected, but if two or more shall have the highest and equal number of votes for the same office, one of them shall be chosen by joint vote of both houses. Contested elections shall likewise be determined by both houses of the general assembly in such manner as is or may hereafter be prescribed by law.'' The gist of the opinion is found in the following paragraph:

''Here the whole question is settled; the manner of filling the executive chair is prescribed; the time of elections (sec. 3, art. XV) is fixed; the manner of voting (sec. 1, art. VIII); how the return shall be inclosed; to whom transmitted; how and where they shall be published; how the result shall be declared, and if aspirants have the same vote, how one of them shall be chosen, and if the election is contested, how it shall be determined; and in this it seems they intended to cover the entire ground, and to dictate the mode of determining who shall be the executive, and thus fixing the tribunal to try this issue, and nowhere intimating that the high prerogative of deciding this question should belong to any other tribunal, carries to our mind the conviction that it was intended to be exclusive.'' State ex rel. v. Baxter, Governor, 28 Ark., 195.

Taylor v. Beckham, 108 Ky., 278, 49 L. R. A., 263, 94 Am. St., 357, is a notable case, which was carried to the United States Supreme Court, where it is reported in 178 U. S., 548. It deals with the relative powers of the Legislature and of the courts under constitutional provisions like our own. The Kentucky Court of Appeals held in that case:

''The Constitution of this State creates the offices of governor and lieutenant governor. It provides how they shall be filled by election. It also provides how the result of that election shall be determined.

In each of the four Constitutions of this State the general assembly has been made the exclusive tribunal for determining this matter. This shows a clear and settled purpose to keep this political question out of the courts. We have no more right to supervise the decision of the general assembly in determining the result of this election than we have to supervise the action of the governor in calling a special session of the Legislature, or in pardoning a criminal, or the action of the Legislature in contracting debts, or determining upon the election of its members, or doing any other act authorized by the Constitution.''

An election contest necessarily involves questions of both fact and law. It may be predicated upon a status or upon facts which existed before an election, upon what took place at the election, and perhaps in some instances upon a status or what took place after an election. The ineligibility of a candidate before an election, whether arising from lack of age, or from personal misconduct, or other infirmities, the manner of giving notice of the election, appointing election officers, their qualification, the creation of election districts, the preparation of the polls or polling places, the manner in which the ballots may have been prepared, and various other things which of necessity precede an election, are well known subjects of election contests.

A failure to observe any one or more of the many Articles of Title 49, Revised Statutes, applicable to general elections, may become the subject matter of an election contest, and many of these provisions concern matters which must occur before the time of actual voting. In determining what a ''contested election'' is, we must bear in mind that an election in this State is not a single event, but a *process*, and that the entire *process* is subject to contest. The ''election'' for governor does not end until the result is declared. State ex rel. Morris v. Bulkeley, 61 Conn., 359 14 L. R. A., 657.

In view of the general rules to which we have referred, we would undoubtedly be doing violence to the constitutional provision which places the power of hearing a contested election in the Legislature, if we were to say that the courts were likewise given power over contests of election for governor, merely because the courts generally have power over justiciable questions, and may, on occasion, have power over results which flow from the decisions of bodies having jurisdiction of contested elections.

Notwithstanding the present suit was brought before the election; its subject-matter is one confided to the Legislature in a contest over the election, and it is therefore withdrawn from the courts. The Constitution has erected the tribunal and fixed the time and place of determining election contests for governor, and every justiciable

issue in such a contest must be there disposed of. The tribunal erected is a joint session of the Legislature; the time is the first week of the session of the Legislature; the place is the capitol of the State. The subject-matter is everything which can be legally embraced in the phrase "contested elections."

✓ Such a contest may embrace every part of the *"process"* of electing a governor, for the reason that the *"election"* which may be contested is not merely the acts of voting, but every step regulated by law, from the announcement of the candidate to the declaration of the result.

The Legislature is wholly without power to erect another tribunal for determining a contested election for governor. It is wholly without power to determine that the contest shall, either in whole or in part, be heard before any other tribunal than the joint session of the Legislature, and at the time specified in the Constitution. It is equally without power to confer upon any other tribunal authority to determine any justiciable issue which could arise in a contest before the joint session of the Legislature.

The language of the Constitution furnishes no sanction for the withdrawal of questions of law any more than questions of fact from determination by the Legislature. All questions, whether of law or fact, are alike committed to the Legislature, which may be involved in a contest of the right of any one to hold an elective, executive, state office as the result of a general election.

We do not mean to express any opinion as to whether Section 3 of Article IV prevents the courts from adjudicating private rights growing out of elections. This case involves no such inquiry. Nor is it necessary that we stop to inquire about the effect of the Legislature's action when without jurisdiction or in excess of constitutional power. The time to consider such questions in this court cannot come until they are presented to the court in a proper proceeding.

The broad and general terms of Section 8 of Article V cannot prevail over the specific terms of Section 3 of Article IV. San ✔ Antonio v. Toepperwein, 104 Texas, 45, 133 S. W., 416; Warren v. Shuman, 5 Texas, 441.

In People v. Hall, 80 N. C., 122, the court, in considering the effect of constitutional provisions conferring general judicial power on the courts, in connection with other sections of the Constitution authorizing the Legislature to judge the qualifications of its members said:

"When it is said on such occasion to either house of the Legislature 'You are to be the judge of the election of the members of your own body', there is a specific conferment of this particular power; and when it is said at the same time to the judicial body, 'You are to have general jurisdiction in law and equity', though the conferment

of power is general, there is, by the force of the concurrent action, excepted from the general grant the specific authority definitely bestowed with the same breath upon another body. In such case it may well be that a form of words in the instrument that clearly makes a gift of judicial power to one co-ordinate body should be construed as reserving the particular power thus bestowed from the general conferment of judicial power by the same instrument, at the same time, upon another co-ordinate body.''

The decision in Ferguson v. Maddox, (ante p. 85) 263 S. W.. 888, has no bearing whatever °on the jurisdictional questions now under consideration. The opinion in Ferguson v. Maddox determines the precise questions before the court under the certificate from the Galveston Court of Civil Appeals. The Supreme Court is never to be understood, as it has heretofore declared, to make determinations, by implication or otherwise, in opinions answering certified questions, with respect to anything save the precise questions answered—no matter what questions might be said to arise on the facts of the case certified. The Supreme Courts enters no judgment on answers to certified questions. The Court of Civil Appeals instead enters the proper judgment on the law and facts, being bound to abide by the decision of the Supreme Court as expressed in its determination of the certified questions. Clary v. Hurst, 104 Texas, 425, 138 S. W., 566. No question having been certified in Ferguson v. Maddox with reference to the trial court's jurisdiction or as to the validity of Articles 3082, 3083 and 3083a no such question was decided.

Moreover, the questions we are determining did not and could not arise under the facts of Ferguson v. Maddox. These questions relate entirely to a voter's right to invoke the jurisdiction sought to' be conferred by Article 3084a on the District Court to prevent the name of a candidate for governor appearing on ballots in a *general* election. The whole controversy in Ferguson v. Maddox was over preventing the name of a candidate for governor from appearing on ballots at a *primary* election. The only election governed by Section 3 of Article IV is the general election. Koy v. Schneider, 110 Texas, 369.

Speaking of primaries, the Supreme Court of the United States said in Newberry v. United States, 256 U. S., 250, 65 L. Ed., 913 as this court had said in substance in Koy v. Schneider, supra: ''They are in no sense elections for an office, but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors.''

It is not claimed that appellant Dickson has any interest in the subject-matter of this suit other than to subserve the public interest. His lack of special interest is fatal to his capacity to maintain his suit in the absence of a valid statute authorizing him to sue. San

Antonio v. Strumberg, 70 Texas, 366, 7 S. W., 754. Again, as plainly declared by this court in Staples v. State, 112 Texas, 68, 245 S. W., 641, ''Where the suit is for the benefit of the public at large, and no citizen is affected differently from all other citizens, the State as an agent of all is properly interested for the benefit of all citizens''; and, such a suit can only be maintained by those authorized under the Constitution to protect public rights and interests. It is unnecessary to add more on this question to the satisfactory discussion in the opinion in the Staples case.

By the third and fourth questions, the Court of Civil Appeals inquires whether Mrs. Miriam A. Ferguson is ineligible to hold the office of governor, because she is a woman or because she is a married woman.

These questions have been briefed and argued with zeal and earnestness commensurate with their importance. On their solution depends the right of all women to hold office in Texas under the present Constitution.

The grounds advanced for declaring Mrs. Ferguson ineligible for governor because she is a woman or because she has a husband are as follows:

First: The language of the Constitution, in creating the office of governor and in prescribing the governor's qualifications and duties, clearly manifests an intention to exclude all but men from that office.

Second: Since the Common Law was adopted in Texas in 1840 and was continued in force by the Constitution, and since under the rules of the Common Law women, and particularly married women, were ineligible to hold office, and since the character of the governor's duties renders their proper performance impossible by an unmarried woman, or by a married woman, the Constitution must be construed in the light of the Common Law, and so construed, neither the Constitution nor the statutes of Texas authorize an unmarried woman or a married woman to become governor of the State.

Third: The suffrage amendments to the Federal and State Constitutions have not changed the status of women from that of ineligibility to that of eligibility to public office.

When the competency of women to hold office in Texas is challenged, the fundamental inquiry is as to the extent of restrictions on the people in their sovereign capacity with respect to freedom of choice of their public servants. No further authority need be cited to demonstrate the correctness of this position than the language which this court, through its great justice, Reuben, R. Gaines, quoted with approval in Steusoff v. State, 80 Texas, 430, 12 L. R. A., 364, 15 S.W., 1100, as follows: ''Eligibility to office is not declared as a right or principle by any express terms of the Constitution, but it results

as a just deduction from the express powers and provisions of the
system. The basis of the principle is the absolute liberty of the
electors and the appointing authorities to choose and appoint any
person who is not made ineligible by the Constitution. Eligibility
to office, therefore, belongs, not exclusively or specially to electors
enjoying the right of suffrage. It belongs equally to all persons
whomsoever not excluded by the Constitution.''

To approach the subject from any other viewpoint would not
accord with the constitutional history of Texas. Among the first
words of the State's Declaration of Independence, adopted March
2nd, 1836, is the declaration that government derives all its legitimate
powers from the people. In the Constitution of the Republic is a
statements of rights never to be violated on any pretence whatever.
There we find it recorded that ''all political power is inherent in the
people and all free governments are founded on their authority and
instituted for their benefit.'' The declaration is carried into every
Constitution, appearing as Section 2 of Article I of the Constitution
of 1876. With the ultimate political sovereignty of the people so
forcefully declared throughout our history, the court would be
unmindful of its high responsibility were it not careful in examining
any claim of restriction on the liberty and authority of those who
establish governments and can change them in the mode prescribed
by the fundamental law.

How early this court declared against any presumptions in favor
of such restrictions as we are asked to discover and enforce in this
case is disclosed by the report of the case of McMullen v. Hodge
in 5 Texas at page 73. In that case the first Supreme Court, through
Justice Lipscomb, in referring to constitutional conventions, said:
''It would be in the power of such conventions to take away or
destroy individual rights but such an intention would never be
presumed; and to give effect to a design so unjust and unreasonable
would require the support of the most direct, explicit, affirmative
declaration of such intent.'

A careful analysis of the controlling sections of the Constitution,
in the light of the proceedings of the constitutional convention and
of the terms of previous constitutions, makes it entirely clear that the
electors of this State have left themselves free to choose a governor
without regard to the sex or coverture of the person of their choice.

Section 3 of the Schedule of the Constitution of the Republic
contained a provision requiring that one be a *male* citizen, as well
as be otherwise qualified, in order to hold any office under the
Republic.

The Journal of the Constitutional Convention which framed our
present organic law shows that a similar resolution, which would have

made it requisite that one be a male in order to be thereafter eligible to office in Texas, was presented but was not adopted. Journal, page 93. It was also proposed to amend the requirement that the governor be thirty years of age by substituting therefor that he be "a qualified elector". In connection with the provision confining suffrage to the male sex, such an amendment would have rendered women ineligible to the governorship. The convention rejected the amendment by a vote of fifteen in favor of it to sixty-four against it. Journal, page 298.

Significant too was the change made by the Constitution of 1876 in the form of oath to be taken before entering upon the discharge of the duties of any office in Texas. The Constitution of 1869, Section 1, Article XII, required each officer, before performing any duty to swear "that I am a qualified elector in this State." Section 14 of Article III of the same Constitution prohibited the holding of any office, state, county or municipal, by a person not a registered voter. The first qualification of an elector under that Constitution was that he be a *male* citizen of the United States. The Constitution of 1876, while still requiring electors to be males, struck out from the oath of office the words, "I am a qualified elector."

In fixing the qualifications of members of the legislative department in the article immediately preceding that dealing with the executive department, the Constitution required that the senators and representatives be qualified electors. These officers were thus confined to the male sex. Having already had their attention directed to sex as a basis for qualification for important constitutional offices, how could it be doubted that the omission by the constitution makers to require governors to be chosen from the male sex was deliberate?

The Constitution itself is so explicit in stating who shall be eligible and who shall be ineligible for governor as to remove all difficulty in answering the questions certified. Section 4 of Article IV says of the governor: "He shall be at least thirty years of age, a citizen of the United States, and shall have resided in this State at least five years immediately preceding his election." Here is a statement of the affirmative qualifications which the governor must possess. Section 9 of Article XII states no person holding office under the United States shall be eligible to any office under the State. Section 3 of Article XII forbids any citizen of the state from holding any office, who, after the adoption of the Constitution, fought a duel with deadly weapons, or committed an assault on any person with deadly weapons, or acted as second at a duel, or sent or accepted a challenge to fight a duel. Section 1 of Article XVI, in prescribing the oath of office, renders one ineligible to hold any

office who has paid, offered, furnished, or contributed anything of value, or promised any office or employment, as a reward for giving or withholding a vote. There are other provisions negativing the right to hold office, including that of governor. None are based on sex or coverture.

Mrs. Ferguson comes within the terms of none of the constitutional provisions stating who shall not hold the office of governor She is at least thirty years of age. She is a citizen of the United States. She has resided in this State more than five years before the general election. Possessing every affirmative qualification which the Constitution declares requisite to eligibility, and being under no disqualification working ineligibility under the provisions of the Constitution, it must be held that she meets every test prescribed for the governor by the supreme law of the State.

Much stress is laid in arguments for appellant on the fact that the words "he" and "his" are used in Section 4 of Article IV in defining the governor's qualifications. Since we have no English word, which in the singular number, includes both "he" and "she", the most appropriate word, under common usage, to include both sexes while using the singular number, is the word "he". The context of the Constitution as a whole plainly reveals the sense in which "he" is used. Cooley says: "As a general thing, it is to be supposed that the same word is used in the same sense whenever it occurs in a constitution." Cooley's Constitutional Limitations, 95. That "he" must include "she" is obvious when we read such sections as Section 10 of Article I, where in stating the rights of the accused in criminal prosecutions the following language is used: "*He* shall have the right to demand the nature and cause of the accusation against *him*. * * * *He* shall not be compelled to give evidence against *himself*," etc.

Besides, Section 48 of Article XVI continued in full force all laws then in force not repugnant to the Constitution of the United States or of the State. One of the laws then and now in force, enacted January 16, 1840, declared: "The masculine gender shall include the feminine and neuter." Art. 5502 R. S.

In determining that the use of the pronoun "his" in stating an officer's qualifications in the Constitution did not bar a woman, the Supreme Court of Missouri said:

"It is part of the general law of the State (and was before the time of the present Constitution) that where persons are referred to by words importing the masculine gender, females as well as males should be deemed included thereby, unless a contrary intent appears by the context or otherwise. Rev. Stats. 1855, p. 1024, Sec. 10; Rev. Stats., 1889, Secs. 6568, 6569. The mere use of the word 'his'

in the Constitution, in referring to the qualification of officers, we do not regard as evidencing a purpose to limit all office holding to the male sex, or as depriving the people of St. Clair County of the right to select a woman as clerk of their county court.'' State v. Hostetter, 138 Mo., 636, 59 Am. St., 515, 38 L. R. A., 208, 39 S. W., 270.

In giving to the words ''he'' and ''his'' the same meaning they had consistently had in the law of Texas for more than a third of a century before the Constitution was adopted, we adhere to the ancient rule that ''the obvious common sense meaning of the terms is the one in which they should be understood.'' Republic v. Skidmore, 2 Texas, 265.

Does the early adoption of the Common Law and its continuation by the Constitution militate against the decision that Mrs. Ferguson is eligible for the office of governor of Texas?

The Constitution is the supreme law of the State. It is elementary that a statute or principle of the Common Law in conflict with the Constitution is void. So, if there be any conflict between the Common Law, declaring Mrs. Ferguson ineligible and the Constitution, declaring her eligible, it is our plain duty to give effect to the Constitution.

No one disputes this proposition. The insistence of appellant is that, construing the Constitution in the light of the Common Law, it declares only men, or at least only men and unmarried women, to be eligible to hold the office and perform the exalted functions of chief executive of the State. We find no substantial basis for such an insistence in Texas.

Quite true it is that under the ancient Common Law the legal personality of the wife was considered merged in that of the husband, so that she was regarded as without judgment or will of her own, and without capacity to own or convey property or to sue or be sued. 1 Cooley's Blackstone (3rd Ed.), 441. If that were woman's true status today under the Constitution and laws of Texas, she would be utterly ineligible to public office. The truth is that the old Common law principles invoked against Mrs. Ferguson have never been in force in Texas, and certainly are not in force at the present time.

England, as she advanced in Christian civilization, was fast to find means to rid herself of the iniquities which must have resulted had some of the strict Common Law rules governing marital rights and duties been rigidly applied. Thus, English courts of equity created and recognized for married women rights, interests, and capacities to such an extent that they were enabled to beneficially hold, use, enjoy, and alienate property. Johnson v. Gallagher, 3

De Gex, F. & J. 494, 3 Pomeroy's Equity Jurisprudence, Sec. 1098. Moreover, the English ecclesiastical courts administered the civil law under which "the husband and wife. are considered as two distinct persons, and may have separate estates, contracts, debts, and injuries," * * * and the wife may "sue and be sued without her husband." 1 Cooley's Blackstone, 443. And we find Lord Chief Justice Tindal, speaking of the ecclesiastical law forming a part of the Common Law of England. Rex vs. Mills, 10 Cl. & F. 534, 671. Mr. Bishop concludes that the common law embraced that administered in courts of law, in courts of equity, and in the ecclesiastical courts. 1 Bishop on Marriage & Divorce, secs. 56, 57, p. 44.

By the old Roman law, from which many of the harsh rules of the Common Law were derived with respect to married women, under certain circumstances the wife become subject to the absolute dominion of the husband, her personality was merged in his, and she had no power to acquire property. But this began to be changed even prior to the early Roman Empire, until finally these old doctrines were superseded by the new doctrines of the Civil Law, "which involved the almost absolute independence of husband and wife, at least so far as their legal rights were concerned." Morey's Outlines of Roman Law, 243, 1511; 2 Sherman's Roman Law in the Modern World, 60.

It was because the founders of the Republic recognized the greater justice of the modern civil law, on the subject of marital rights, which came to Mexico through Spain, that when Texas came to adopt the Common Law, it was enacted as a part of the act for its adoption that the marital rights of husband and wife should be governed by regulations entirely at variance with the Common Law principles on which reliance must be placed to deprive a married woman of her separate indentity, her discretion, and her will, and subject her to the husband's dominion, so as to disqualify her from holding public office.

In Cartwright v. Hollis, 5 Texas, 152, the court, by Chief Justice Hemphill, declares that the State's obvious purpose in the first regulations of marital rights "was to preserve from the Spanish system of jurisprudence those rules, with some modifications, which regarded the matrimonal union, so far as property was concerned, as a species of partnership, and in which each partner might have separate estates or property, as well as a common stock of acquisitions and gains. They have no analogy to the strict principles of the Common Law; and they exclude all such rules and doctrines as merge the individuality of the wife in the person of the husband; at least so far as the rights of the parties to property are in question, and which preclude the idea that the wife may have a separate estate

and interest." Again, it is said in another opinion of Chief Justice Hemphill: "But the common law is not and never has been in force in this State on the subject of marital rights." Bradshaw v. Mayfield, 18 Texas, 21.

Barkley v. Dumke, 99 Texas, 150, 87 S. W., 1147, recognized that the strict rules of the Common Law about marriage would lead to gross injustice to innocent women, and the court in that case refused to follow the Common Law, adopting instead the law of Spain.

The doctrine which must be sanctioned to disqualify Mrs. Ferguson was distinctly repudiated by Texas nearly forty years ago, when the Supreme Court said of a married woman. "Here her separate being has not been merged in her husband as at Common Law, but so far as it could be done consistently with the preservation of the home and family, she has been disenthralled." Cullers v. James, 66 Texas, 497, 1 S. W., 314. To the same effect is Rogers v. Roberts, 89 Texas, 613, 35 S. W., 77.

Furthermore, the fact that the supposed reasons for the rule against married women holding office were, and are, untrue, and that the rule is wholly discordant with the traditions, customs, and morals of our people, would forbid the rule's adoption. For, as said by this Court in Mayne v. Lone Acre Oil Co., 98 Texas, 605, 69 L. R. A., 986, 8 Am. Cases, 1117, 86 S. W., 742: "In other instances rules established in England were not regarded as of controlling authority in this State, for the reason that it was thought that the conditions here were so different from those existing in England that if the conditions in that country had been the same as in this the ruling there would have been different." Of like purport is the reasoning in State v. Quible, 86 Neb., 417, 27 L. R. A., (N. S.) 531, 21 Ann. Cases, 401, 125 N. W., 619, and In Re Leach, 134 Ind., 665, 34 N. E., 541, 21 L. R. A., 701.

An examination of the authorities and of history will, we think, disclose that there was no fixed rule of the Common Law against the eligibility of a woman, or of a married woman, for office. The authorities show, we believe, that in every instance in which a woman's right to hold office was questioned prior to the present generation, she was held to be competent, although the courts often remarked that women were not competent to hold all offices. Missouri v. Hostetter, 137 Mo., 636, 38 L. R. A., 208, Note page 215, 59 Am. St., 515, 39 S. W., 270.

We have no doubt that the Court of King's Bench of England, in a case decided in 1788, styled The King v. Alice Stubbs et al., Vol. 2 Dunford & East's Reports, page 395, correctly stated the prevailing opinion as to the law of England at that time on the subject of the right of a woman to hold office. Mrs. Alice Stubbs

had been appointed one of the overseers of the poor of the township of the monastery of Ronton Abbey, for the County of Stafford. Her appointment was contested on the ground that she was a woman and incompetent to hold the office. The court held that she was competent, and confirmed her in the office, saying: "As to the second objection, we think that the circumstance of one of the persons appointed being a woman does not vitiate the appointment. The only qualification required by 43 Eliz. is that they shall be substantial householders; which has no reference to sex. * * * There are many instances where in offices of a higher nature they are held not to be disqualified, as in the case of the office of high chamberlain, high constable, and marshal; and that of common constable, which is both an office of trust, and likewise, in a degree, judicial.''

The statement that women in England at the time might hold these offices, as well as other offices, appears to be sustained by the authorities cited in the case, and others, to which we now make reference: 3 Bouvier's Law Dictionary, p. 3486; See also voluminous notes in 38 L. R. A., 208; Raymond's Reports, Vol. 2, p. 1014; Lady Russell's Case, Eng. Reports (Reprint), Vol. 84, p. 578; Woman Governess of the Workhouse, Eng. Reports (Reprint), Vol. 91, p. 654; Olive v. Ingram, Eng. Reports (Reprint), Vol. 93, p. 1067; Duke of Buckingham's Case, Eng. Reports, (Reprint), Vol. 73, p. 640; Ex parte Burrell, Eng. Reports (Reprint), Vol. 1, p. 850.

It is, however, not so much the Common Law as it may have existed in England, which was adopted by the Act of 1840, as it is the Common Law of England as understood and declared by the different courts of the United States, to which we look in determining a question of first impression in this State. Grigsby v. Reib, 105 Texas, 597, L. R. A., 1915E, 1, Ann. Cases, 1915E, 1, 1915C, 1011 153 S. W. 1124.

It is clear that there is considerable conflict in the decisions of our several States on woman's eligibility to hold office while she was denied the ballot. Such conflict would authorize this Court to follow the juster rule if the question had to be treated as entirely controlled by the Common Law, and unaffected by suffrage amendments.

Consideration of the true nature of public office will suffice to show that it would be wholly inconsistent with our law recognizing the capacity of married women to become agents and trustees, to deny married women the capacity to hold office. Smith v. Strahan, 16 Texas, 321, 67 Am. Dec., 622; Black v. Bryan, 18 Texas, 461; Holman v. Oil Co., 152 S. W., 885; Fielder Lumb. Co. v. Smith, 151 S. W., 605; Nickelson v. Ingram, 24 Texas, 630. An office is essentially a trust or agency for the benefit of the public. The supreme qual-

ification is unselfish fidelity to duty. Who will say that her sex prevents a woman from displaying this virtue in as marked a degree as the greatest of men?

The decisions seem in general accord that the suffrage amendments making women qualified electors have removed any pre-existing sex ineligibility to office.

In the Opinion of Justices, (240 Mass., 601,) 135 N. E., 173, it is said:

"Under a constitution framed and phrased as is the Constitution of Massachusetts, we think that an amendment thereto adopted by the people of this Commonwealth, striking out the word 'male' wherever it occurred as a limitation upon the right to vote, would plainly make women eligible to office upon the same footing as men. It seems to us that when the same effect is wrought by an amendment to the Constitution of the United States, the same result follows. The constitutional situation has become so changed by the supervention of the Nineteenth Amendment to the United States Constitution with its consequent operation upon the Constitution of Massachusetts as to render no longer of force the opinions of the Justices in 107 Mass., 604, and 165 Mass., 599, 43 N. E., 927, 32 L. R. A., 350. The firm foundation upon which they rested has been swept away by that amendment."

The reasons for holding women eligible to hold office by reason of the removal of the bar against their participation in the ballot seems of peculiar force in Texas. For, the two rights to vote and to hold office appear associated in many provisions of former Constitutions as well as of our present Constitution, as in Section 1 of Article VI of the Constitution of 1869, and in Sections 4 and 9 of Article 16 of the Constitution of 1876.

In fact, it is to blind one's eyes to the truths of current history not to recognize that the last vestige of reason to sustain a rule excluding women from office was removed when she was clothed with equal authority with men in the government of State and Nation. through the ballot. When the reason for the rule of exclusion has failed, the rule should no longer be applied. 12 C. J., 179.

The fifth question enquires whether Mrs. Ferguson was rendered ineligible by the decree of the Senate of Texas, sitting as a court of impeachment, removing her husband, Jas. E. Ferguson, from the office of Governor and adjudging that he be henceforth disqualified to hold any office of power, trust or profit under the State.

Appellant's position is that the emoluments of the office of governor are community property, and that Jas. E. Ferguson could not receive his community half of his wife's salary as governor without violating the decree of impeachment.

It is unnecessary to enquire into the exact status of the wife's salary from public office as separate or community property, under our present Constitution and statutes. For, if it be assumed that Mrs. Ferguson's salary as governor would belong to the community estate of her husband and herself, still Jas. E. Ferguson would not be receiving or sharing any emolument or profit derived from any office held by Jas. E. Ferguson under the State. The emolument would be derived from Miriam A. Ferguson holding an office and performing its duties. Such a disqualification as is here insisted on could be supported on no other theory than that of legal identity of husband and wife, and that theory we definitely repudiate, as it has been unformly rejected from the earliest cases determined by this Court.

The Constitution forbids the imposition of penalties on members of the family of an impeached governor, by declaring that the senate's judgment of impeachment shall extend, in addition to punishment after indictment and trial, *only* to removal from office and disqualification to hold office under the State.

There is a third reason why no supposed community interest of Jas. E. Ferguson in the salary of an office held by his wife should render his wife ineligible to hold such office. And that is, if by his wrong he had deprived himself of any right to share such salary, the same would become his wife's separate estate. Wright v. Hays, 10 Texas, 136, 60 Am. Dec., 200; Nickerson v. Nickerson, 65 Texas, 281.

The sixth, and last, certified question is whether plaintiff's charge was established as a matter of law that Jas. E. Ferguson was the real candidate for governor, and that his wife's name was used as a mere subterfuge to evade the decree impeaching Jas. E. Ferguson.

The only proof to establish the charge was a campaign circular issued by Mrs. Ferguson when a candidate for the Democratic nomination for governor, and articles in "The Ferguson Forum". These instruments are many pages in length. The parts most pertinent to the certified question announce that Mrs. Ferguson is running on a platform previously promulgated by her husband, who would be the candidate but for the adjudication of his ineligibility, and pledges the best efforts of both Mrs. Ferguson and husband to give the people the best administration which their ability and gratitude can produce. After carefully considering the circular and articles, we conclude they negative the claim that Mrs. Ferguson was not the real candidate for governor, and are wholly insufficient to establish as a matter of law any conspiracy to use her name as a subterfuge to escape the effect of the impeachment decree.

To each of questions 1 and 2 the court answers "yes".

To each of questions 3, 4, 5 and 6 the court answers "No".