O’NIELL, C. J.
 

 This suit is brought by the Attorney General on behalf of the state, and by two taxpayers, complaining of an alleged unlawful expenditure of public funds. The main object of the suit is to prevent persons holding office in one of the departments of the state government from being employed to exercise powers or functions belonging to another of the three departments. Another object of the suit is to prevent the Louisiana highway commission and its members from employing attorneys at law for the commission without the approval of the Attorney General.
 

 The plaintiffs alleged that there were sixteen members of the Legislature employed by executive officers, boards, and commissions, at salaries amounting to $48,000 per annum, payable monthly. The record discloses that there were in fact, when this petition for an injunction was heard, three Senators employed by the highway commission, each drawing a salary of $350 per month, one of them serving as an attorney for the commission, one as chief enforcement officer, and the other as assistant to the general maintenance superintendent; that there were two members of the House of Representatives employed by the highway commission, as attorneys at law, each drawing a salary of $350 per month; that there were seven other members of the House of Representatives employed by the highway commission at salaries ranging from $150 to $250 per month, three of them being listed as right of way men, one as construction superintendent, one as superintendent of maintenance district No. 9, one as a gravel inspector, and the seventh as an assistant superintendent. The record shows that there is also a member of the House of Representatives employed as warden of the state penitentiary, by the manager, at a salary of $400 per month, another member of the House of Representatives employed as law clerk by the state board of health, at a salary of $150 per month, and another member of the House of Representatives employed as an accountant by the state superintendent of public accounts, at a sálary of $175 per month. There are therefore fifteen members of the Legislature employed in executive depart
 
 *1049
 
 ments of the state government and drawing salaries amounting to $46,200 per annum.
 

 It is alleged that this practice of employing members of the Legislature in the executive department of the state government tends to destroy the independence of the legislative department, is making the legislative department subservient to the executive department, is making it possible for the executive department to exercise undue influence and control over the legislative department, is contrary to public policy, public welfare and public morals, is violative and destructive of the principles of a republican form of government, and violative particularly of article 2 of the Constitution of Louisiana.
 

 The complaint in this particular suit is directed against the employment of the State Senator and two members of the House of Representatives as attorneys for the state highway commission, because it is alleged that their employment, without the consent or approval of the Attorney General, is violative also of sections 55 and 56 of article 7 of the Constitution, making it the duty exclusively of the Attorney General or one of his assistants to attend to and have charge of all legal matters in which the state has an interest, or to which the state is a party, and giving the Attorney General the exclusive authority to appoint his assistants.
 

 In response to the petition, the district judge issued a rule on the highway commission and its members to show cause why a preliminary injunction should not issue, forbidding them to employ the three members of the Legislature, or any of them, as attorneys for the highway commission, or in any other capacity, and forbidding the highway commission to pay or otherwise compensate them for that or any other service, out of the funds of the state or of the highway commission.
 

 The defendants filed an exception of no cause or right of action,'and an answer to the rule, which was submitted on a statement of facts, mutually admitted, subject to the defendants’ objection that the facts with regard to the employment of members of the Legislature in other departments of the state government were irrelevant and immaterial. The district judge overruled the exception of no cause or right of action, and gave judgment against the defendants, making absolute the rule to show cause, and issuing an injunction against the employment of the three members of the Legislature as attorneys for the highway commission. The defendants filed a motion, first, for annulment of the judgment on the ground that it was not signed within three days after it was rendered, and, in the alternative, for a suspensive appeal from the judgment. The judge refused to annul the injunction, or to grant a suspensive appeal from the judgment, but granted a devolutive appeal. The defendants then applied to this court for writs of certiorari, prohibition, and mandamus; which were refused on the ground that the appeal which had been allowed furnished the defendants a sufficient remedy if the injunction should not have been granted. See Saint, Attorney General, et al. v. Allen et al., 169 La. 265, 125 So. 72. The case is now before us on appeal. The plaintiffs, answering the appeal, pray for an amendment of the judgment so as to enjoin the highway commission and its members from employing the three members of the Legislature, or compensating them, not only as attorneys for the highway commission, but in any other capacity, as long as they remain in office as members of the Legislature.
 

 Appellants argue extensively in their brief that the judgment appealed from is null
 
 *1051
 
 because it was not signed within three days, but was in fact signed on the 7th day, after it was rendered. They cite and rely upon Act 40 of 1904, p. 76, amending and re-enacting section 5 of Act 163 of 1898, p. 320, and declaring that all judgments rendered by the district courts shall be signed within three days from the date of rendition. The act of 1898 made it three
 
 judicial
 
 days. The act of 1904 omitted the word “judicial.” The act of 1898 declared in its title that its purpose was to carry into effect article 117 of the Constitution of that year; and in the article it was said that the judgments of the district courts should be signed
 
 after
 
 three days from the rendition thereof. The same provision appears in article 646 of the Code of Practice. The language of the act of 1904 and of section 5 of the act of 1898 leaves no doubt that a judgment of a district court need not be signed within three days after it is rendered; for the statute declares that, if a judgment is signed within the three days after it is rendered, and if an application for a new trial is filed within the three days and is eventually granted, the effect is to set aside the judgment previously signed. The decisions are to the effect that a judgment signed within three days after it is rendered is signed “prematurely,” in the sense that it does not become effective until the three days have expired, or until the application for a new trial has been denied, if one has been filed subsequent to the signing of the judgment but within the three days after it was rendered. State ex rel. Wellman v. Bell, Judge, 143 La. 662, 77 So. 493; Ryland v. Harve M. Wheeler Lumber Co., 146 La. 787, 84 So. 55. There is therefore no merit in the contention of the appellants that the judgment appealed from is null because it was not signed within three days after it was rendered.
 

 The exception of no cause or right of action, filed in the district court, is also argued extensively in appellants’ brief. The right of the Attorney General to bring the suit is conferred by the provisions of section 56 of article 7 of the Constitution, that he, or one of •his assistants, shall attend to and have charge of all legal matters in which the state has an interest, or to which the state is a party, with authority to institute and prosecute, or intervene in, any and all suits or other proceedings, as he may deem necessary for asserting or protecting the rights and interests of the state. Inasmuch as every fact which was proven or admitted on the trial of the rule was alleged in the plaintiffs’ petition, we shall consider and decide the case, as the district court considered and decided it, with reference to the facts proven or admitted on the trial of the rule to show cause.
 

 The important question in this case is whether the practice of employing members of the Legislature to perform services, for pay, in the executive department of the state government is forbidden by article 2 of the Constitution, viz.:
 

 “Section 1. The powers of the government of the State of Louisiana shall be divided into three distinct departments — legislative, executive, and judicial.
 

 ' “Section 2. No one of these departments, nor any person or collection of persons holding office in one of them, shall exercise power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.”
 

 The expression “except in the instances hereinafter expressly directed or permitted” has reference to such instances, for example, as where the Senate is given the executive or administrative power of confirming appoint
 
 *1053
 
 ments, or where the House of Representatives is given the judicial power of impeachment, and the Senate is given the judicial power of trying impeachments.
 

 The principle announced in sections .1 and 2 of article 2 of the Constitution is the foundation on which our system of republican government is established, and is safeguarded in the Constitution of the United States and in that of every one of the states.
 

 James Bryce, in The American Commonwealth, vol. 1, p. 216, chap. 21, on The Legislature and The -Executive, says:
 

 “The fundamental characteristic of the American National Government is its separation of the legislative, executive, and judicial departments. This separation is the merit which the Philadelphia Convention chiefly sought to attain, and which the Americans have been wont to regard as most completely secured by their Constitution. In Europe, as well as in America, men are accustomed to talk of legislation and administration as distinct. But a consideration of their nature will show that it is not easy to separate these two departments in theory by analysis, and still less easy to keep them apart in practice.”
 

 In chapter 3, on The Origin of the Constitution, page 29 of the same volume, the author traces the source and origin of this principle of separation of the three departments or functions of government and, speaking of “The men of the Convention,” and of those serene and constant lights which were before them, says:
 

 “They had for their oracle of political philosophy the treatise of Montesquieu on the Spirit of Laws, which, published at Geneva forty years before, had won its way to an immense authority on both sides of the ocean. Montesquieu, contrasting the private as well as the public liberties of Englishmen with the despotism of Continental Europe, had taken the Constitution of England as his model system, and had ascribed its merits to the division of legislative, executive, and judicial functions, which he discovered in it, and to the system of cheeks and balances whereby its equilibrium seemed to be preserved. No general principle of politics laid such hold on the constitution-makers and statesmen of America as the dogma that the separation of these three functions is essential to freedom. It had already been made the groundwork of several state Constitutions. It is always reappearing in their writings; it was never absent from their thoughts.”
 

 It is conceded by the attorneys on both sides of this case that they have not found a decision, by this or any other court, directly in point. Our attention, however, is directed to the fact that Thomas Jefferson, who, as we shall explain hereafter, was the author of this article which was put into the Constitution of Louisiana, and Hamilton, and Adams, who was its staunchest advocate, plainly intended that the article should apply to a case like this. To illustrate, we quote from The Federalist, vol. 1, No. 51 (Hamilton or Madison) pp. 353, 354, viz.:
 

 “In order to lay a due foundation for that separate and distinct exercise of the different powers of government, which to a certain extent is admitted on all hands to be essential to the preservation of liberty, it is evident that each department should have a will of its own, and consequently should be so constituted that the members of each should have as little agency as possible in the appointment of the members of the others. * * *
 

 “It is equally evident that the members of each department should be as little dependent as possible on those of the others, for
 
 *1055
 
 the emoluments annexed to their offices. Were the executive magistrate, or the judges, not independent of the Legislature in this particular, their independence in every other would he merely nominal,”
 

 • We find also in the same volume of The Federalist, p. 340, No. 48, the intention of Madison, viz.:
 

 “As the legislative department alone has access to the pockets of the people, and has in some constitutions full discretion, and in all a prevailing influence over the pecuniary rewards of those who fill the other departments, a dependence is thus created in the latter, which gives still greater facility to encroachments of the former.”
 

 And in No. 47, at page 338 of the same volume, we find Madison’s admonition, with regard to the preservation of the independence of each department of government, viz.:
 

 “It is equally evident that, in reference to each other, neither of them ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers. It will not be denied that power is of an encroaching nature, and that it ought to. be effectually restrained from passing the limits assigned to it.”
 

 In No. 47, on pages 330 and 332 of the same volume, Madison refers to Montesquieu' as the author of this doctrine of the independence of each department of government, viz.:
 

 “The oracle who is always consulted and cited on this subject is the celebrated Montesquieu. If he be not the author of this invaluable precept in the science of politics, he has the merit at least of displaying and recommending it most effectually to the attention of mankind. Let us endeavor, in the first place, to ascertain his meaning on this point.
 
 * * *
 

 “The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning, ‘When the legislative and executive powers are united in the same person or body,' sáys he, ‘there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner.’ * * * Some of these reasons are more fully explained in other passages; but, briefly stated as they are here, they sufficiently establish the meaning which we have put on this celebrated maxim of this celebrated author.”
 

 The-excerpt quoted from Montesquieu by Madison appears in the Analysis by D’Alembert of The Spirit of Laws, vol. 1, Book 11, chap. 11, p. 174.
 

 According to article 18 of the Civil Code, the universal and most effectual way of finding the true meaning of a law, if its expressions are doubtful, is to consider the reason and spirit of it, and the cause which induced its adoption. Hence, for an accurate understanding of this article in the Constitution of Louisiana, and its applicability to the case before us, we must trace the history of the article, and consider the reason which induced its authors to write it — the object which they intended to accomplish, and the evils which they intended to avoid.
 

 The importance of sections 1 and 2 of article 2 of the Constitution of Louisiana is manifested in some measure by their being the whole article; which, in substance, ap--peared in every Constitution Louisiana has had, except that of 1868, which is generally referred to as the Carpet Bag Constitution. Louisiana’s first Constitution, adopted in 1812, was virtually copied from the Constitution of Kentucky. In her first Constitu
 
 *1057
 
 tion, that of 1792, and in her Constitution of Í799, article 1 was as follows: '
 

 “Section 1. The powers of the government of the State of Kentucky shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy, to wit:’ those which are legislative, to one: those which are executive, to another; and those which are judiciary, to another.
 

 “Section 2. No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others; except in the instances hereafter expressly directed or permitted.”
 

 That language was copied literally as article 1 of Louisiana’s Constitution of 1812; and, by the jurisprudence of the state of Kentucky, particularly the opinions rendered in Commissioners of Sinking Fund v. George, 104 Ky. 260, 47 S. W. 779, 84 Am. St. Rep. 454, and Pratt v. Breckinridge, 112 Ky. 1, 65 S. W. 136, 66 S. W. 405, we are reminded that article 1 of the first Constitution of Kentucky, which afterwards became article 1 of the first Constitution of Louisiana, was written by Thomas Jefferson himself. Having returned from France, and having been appointed Secretary of State, on being informed that the state of Virginia was about to permit Kentucky to become a separate state, and that Kentucky was about to adopt a Constitution, he advised that the first safeguard to be put into the Kentucky Constitution should be to confine absolutely and exclusively to each one of the three departments of government the powers belonging to it alone. He went so far as to say that there was danger in the Federal Constitution in that the clauses defining the powers of each department of the government were .not a sufficient safeguard against an exercise by one department of powers properly belonging to another; and so he wrote the provision which he recommended, and which became article 1 of the Constitution of Kentucky, and sent it to the Convention, in session at Danville; and, when the delegates learned who was the author of the article, says Judge Du Relie, “the respect of Kentucky for the great name of Jefferson carried it through, and it was-at once adopted.”
 

 It is observed in the course of the opinion which we have referred to, in the Kentucky case, that the Constitution of the United States merely provides, in one article (article 1, § 1), that “all legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives”; and it provides, in another article (article 2, § 1), that the executive power shall be vested in the President of the United States; and it provides in another article (article 3, § 1), that the judicial power shall be vested in the courts. Commenting thereon, the author of the opinion (104 Ky. 260, 47 S.W. 779, page 785, 84 Am. St. Rep. 454) says:
 

 “That is the extent of the departmental division under the federal constitution. The Kentucky constitution goes much further; and, had Mr. Jefferson been in America at the time of the adoption of the federal constitution, that instrument would, in all probability, have contained the enactment which we find only in the constitution of Kentucky with its three distinct provisions: First, that the government shall be dvided into three distinct departments; second, that each of them shall be confided to a separate body of magistracy; and, third, that no person or collection of persons shall exercise any power properly belonging to either of the others, except in the instances thereinafter expressly directed or permitted.”
 

 
 *1059
 
 Wte note that Judge Du Relie, in his opinion in the Kentucky case, characterized those provisions as “the enactment,” which he found only in the Kentucky Constitution. Judge Du Relle’s opinion, when rendered, was not authority, except for the historical information which it contained, because the majority of the members of the court did not then agree with him that the Kentucky statute in question was unconstitutional; but Judge Du Relle’s opinion afterwards became authority, for it was adopted as the prevailing opinion in Pratt v. Breckinridge, 112 Ky. 1, 65 S. W. 136, 66 S. W. 405; where it was held that the Legislature had not, under its authority to create a public office, the power to elect or appoint the officer or officers to fill it.
 

 The “Constitution or Form of Government for the Commonwealth of Massachusetts,” as it was originally styled, and as adopted in 1780, was written by John Adams, substantially as adopted; and it has ever since remained the Constitution of that state. In article 30 of part the first, the safeguard, of which section 2 of article 2 of Louisiana’s Constitution is intended to be the counterpart, is expressed thus:
 

 “30. In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exei’cise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men.”
 

 That lofty idea — to the end that it may be a government of laws and not of men — ■ was in the mind of the statesmen who after-wards wrote the Constitution of the United States, although the idea was not specifically expressed. John Marshall, in Marbury v. Madison, in 1803 (1 Cranch, 163, 2 L. Ed. 69), said:
 

 “The government of the United States has been emphatically termed a government of laws, and not of men. It will cei’tainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.”
 

 And we may say, as appropriately, that the government of Louisiana will certainly cease to deserve this high appellation- — a government of laws and not of men — if the laws furnish no remedy for a violation of the very article of the Constitution which that appellation comes from.
 

 An interesting discussion of this subject is found in an address delivered to the Kentucky Bar Association, in Lexington on the 5th of April, 1928, by Honorable Charles Warren, who was at one time Assistant Attorney General of the United States, and is the author of The Supreme Court in United States History, and Congress, The Constitution, and The Supreme Court, and other works on the Constitution. The address is published in the Report of the Proceedings, p. 124, and in Case and Comment, vol. 35, No. 2, p. 3. In the course of his address, Mr. Warren reminds us “that it was John Adams who gave George Washington to the Nation,” by having him chosen to head the American armies; that it was Adams who, as president, twenty-six years later, “had - the foresight to appoint John Marshall as Chief Justice of the United States” ; and that to Adams “this country owes the form of its State Constitutions and of its Federal Constitution.” In the course of his address Mr. Warren says:
 

 “And now, in connection with the present day problems, I wish to call your attention briefly to a principle which John Adams em
 
 *1061
 
 bodied in his Massachusetts Constitution. At its very outset he set forth that principle of separation of powers which he had preached, day in and day out, to the delegates of the Congress of 1775 and 1776.
 

 “(Here Mr. Warren quotes Art. XXX of Part First of the Massachusetts Constitution, and proceeds):
 

 “ ‘To the end that it may be a government of laws and not of men.’ Those are great words. Though he did not originate the sentiment, Adams was the first and the only man ever to place them in a Constitution. They are the essential definition of the American system of government. They have been often quoted; yet they cannot be too often impressed on our minds. For they mean that, in this country, there is no right to the exercise of arbitrary power.”
 

 And, in another part of his address, Mr. Warren, says:
 

 “John Adams was the first statesman to explain clearly to the people why, if they were to institute a republican form of government, they must keep the three branches of government, the Executive, the Legislative, and the Judiciary, separate and independent. To ¡have a republic, you must eliminate arbitrary power and unchecked authority. But, as Adams pointed out, any government in which one body (whether King or Legislature) both makes the laws and executes them is essentially an arbitrary government. It is the essence of a free republic, on the other hand, that no man or set of men shall ever have power ‘to make the law, to decide whether it has been violated, and to execute judgment on the violator.’ To preserve liberty to the people, there must be restraints and balances and separations of power.”
 

 Near the end of Washington’s first term as President, and when he had resolved to retire to private life, he addressed ,a letter to James Madison, May 20, 1792, requesting the latter to submit his ideas for a valedictory address, either to be published in connection with his announcement that ¡he would not be a candidate for re-election, or to be delivered as a farewell address. At the same time Washington gave his own ideas to Madison, as to the substance of the address to be prepared. One month later, Madison transmitted to Washington a draft of the proposed address; .but, as the state of public affairs and the loud call of his fellow citizens prevailed upon Washington to remain in the presidency four years longer, Madison’s draft of the address was not used. Before the end of Washington’s second term, he had become politically estranged in some degree from Madison; and so Washington sought other counselors for the preparation of his farewell address. Among them none stood higher in Washington’s confidence than Hamilton, for his talents, patriotism and honesty of purpose. And, so, a draft of ihis address' was sent by Washington to Hamilton for revision, and was sent back and forth from one of them to the other, to “be done with great care, and, at much leisure, touched and retouched,” as Washington said in his letter of May 19, 1796. Although it happened thus that Hamilton, in a sense, edited the final address, it is deemed certain by the students of the subject that it was Washington’s- idea to embody in the address the substance and form of Madison’s previous draft of it. The document is important, therefore, not only because it contains the sentiments of Washington, uttered on a solemn occasion, and designed to benefit his countrymen, but also because it expresses the wisdom of Madison and Hamilton as well, gee
 
 *1063
 
 Sparks’ 'Writings of Washington, vol. 12, pp. 382-S98. It is therefore appropriate to quote from the Farewell Address these pertinent declarations:
 

 “Here, perhaps, I ought to stop. But a solicitude for your welfare, which cannot end but with my life, and the apprehension of danger, natural to that solicitude, urge me, on an occasion like the present, to offer to your solemn contemplation, and to recommend to your frequent review, some sentiments, which are the result of much reflection, of no inconsiderable observation, and which appear to me all-important to the permanency of your felicity as a People. These will be offered to you with the inore freedom, as you can only see in them the disinterested warnings of a parting friend, who can possibly have no personal motive to bias his counsel. Nor can I forget, as an encouragement to it, your indulgent reception of my sentiments on a former and not dissimilar occasion.
 

 * *
 
 *
 
 * * *
 

 “It is important, likewise, that the habit of thinking in a free country should inspire caution, in those intrusted with its administration, to confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and tbps to create, whatever the form of government, a real despotism. A just estimate of the love of power, and proneness to abuse‘it, which predominates in the human heart, is sufficient to satisfy us of the truth of this position. The necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositories, and constituting each the Guardian of the Public Weal against invasions by the others, has been evinced by experiments, ancient and modern; some -of them in our country and under our own eyes. To preserve them must be as necessary as to institute them. If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the constitution designates. But let there be no change by usurpation ; for, though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance in permanent evil any partial or transient benefit which the use may at any time yield.”
 

 We have cited the expressions of opinion of the advocates of this great doctrine of separation and independence of each of the three departments or functions of government, ^merely to determine, as accurately as may be determined, whether they intended that the constitutional provisions on the subject should be sufficient authority, without further legislation, for the courts to sup-px’ess the evil complained of in this case. The only cases in which this prohibition in the Constitution has been invoked heretofore have been cases where the Legislature has enacted a statute purporting to confer upon one department of the government, or upon an official in one department, functions or powers properly belonging to another department. In such cases, of course, the courts have invariably, since the decision in Marbury v. Madisqn, obeyed the Constitution, and declared the statute null. In this instance the' constitutional prohibition is being violated by some of the individual members of the Legislature, by accepting employment, at fixed salaries, to exercise powers or perform duties belonging to the executive department of the government. It cannot be doubted that.
 
 *1065
 
 if tlie Legislature 'Lad enacted a statute purporting to authorize or sanction that practice,. the act of the Legislature would he yiolative of article 2 of the Constitution. It seems equally plain that the act of the individual members of the Legislature is violative of article 2 of the Constitution; for the article forbids, not only each one of the departments of the state government, hut also “any person or collection of persons holding office in one of them,” to “exercise power properly belonging to either of the others.” Hence it would not be reasonable to presume that the authors of this article intended that it should merely prohibit an “act of the Legislature”— meaning a statute — purporting to invest a person or collection of persons holding office in one department of the government with a power properly belonging to another. Such an interpretation of the article of the Constitution would deprive it of its effect, except against the legislative department; whereas, it is clearly intended to be effective against each of the three departments, and even against any person or collection, of persons holding office in any one of them. In every instance where the Constitution imposes a restriction upon or prohibition against acts of the Legislature,. the language makes the constitutional provision applicable only to acts of the Legislature, as, for example, in section 8 of article 1, “No law shall ever be passed to curtail or restrain the liberty of speech or of the press,” and, in section 4 of the same article, “No law shall be passed respecting an establishment of religion,” etc. Article 2 does not declare that no law shall be passed authorizing one of the three departments of the government, or a person or collection of persons holding office in one department, to exercise power properly belonging to either of the others. On the contrary, •the language of article 2 is as effective, without the contemplation of legislation on the subject, as the guaranty against the taking of life, liberty, or property, except by due process of law.
 

 It is argued by counsel for appellants that the state highway department, administered by the Louisiana highway commission, is not a part of the executive department, and therefore that the defendants, holding office in the legislative department, are not exercising power, or performing functions, belonging to another department. It is certain that the highway department is not a part of the legislative department, and it is equally certain that it is not a part of the judiciary department; and hence, as there are not four, but only three, general departments of government, as classified and defined in the Constitution, the highway department must be classified as being in the executive department. To say that these three members of the legislative department are not employed also in
 
 another department
 
 of the government would be the same as to say that the highway department is a branch of the legislative department. It is true that the highway department is provided for in the Constitution in article 6, under the title “Administrative Officers and Boards”; but the word “administrative” is not a denial that these officers and boards are subordinate executive officers and boards. In the arrangement of the articles of the Constitution, defining the three departments of government, articles 3 and 4 deal with the legislative department, articles 5 and 6 deal with the executive department, and article 7 deals with the judiciary department. The words “executive” and “administrative” are often used indifferently and as synonymous terms. Bryce, in his American Commonwealth, vol. 1, chap. 4, p. 33, so uses them, viz.: “The administrative, legislative, and judicial functions for which the .Federal Con
 
 *1067
 
 stitution provides are those relating to matters which must be deemed common to the whole nation,” etc. In fact, in the Constitution of Louisiana, the words “executive” and “administrative” are used as synonymous or interchangeable terms. For example, in section 32 of article 3, we find: “The Legislature is authorized to provide for the merger or consolidation into one department of all executive and administrative offices, boards or commissions, whether created in this Constitution or otherwise, whose duties or functions are of a similar nature or character,” etc. The fact that such officers, boards and commissions are under the title or subtitle of “Administrative Officers and Boards,” instead of being only under the general title “Executive Department,” is a matter of no importance, for the further reason that the Constitution itself declares, in the paragraph 11 of section 1 of article 22, “No title or subtitle, heading or sub-heading, or marginal note, printed in or with this Constitution, shall be considered or construed to be part of this Constitution, but to be inserted only for convenience of reference.”
 

 Counsel, for appellants argue finally that these three members of the Legislature do not, as employees of the highway commission, “exercise power” belonging to the executive department, because they are not officers but only employees of the highway department. The language of article 2 of the Constitution, however, leaves no doubt that it is not a law against dual office holding. It is not necessary, to constitute a violation of the article, that a person should hold office in two departments of government. It is sufficient if he is an officer in one department and at the same time is employed to perform duties, or exercise power, belonging to another department. The words “exercise power,” speaking officially, mean perform duties or functions.
 

 It was admitted by the plaintiffs, on the trial of the rule for an injunction in this case, that there is no charge of fraud, no accusation of collusion, between the executive de-' partment and the members of the Legislature who are employed by the executive department, nor allegation that the services being rendered to the highway department by these members of the Legislature are not worth the salaries. But that has nothing to do with the principle which is being violated. As Washington said, in his Farewell Address:
 

 “If, in the’ opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the constitution designates. But let there be no change by usurpation; for though this, in one instance, may be the instrument of good, It is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance in permanent evil any partial or transient benefit which the use can at any time yield.”
 

 Our conclusion is that article 2 of the Constitution was sufficient authority for the granting of the writ of injunction in this case.. We find it unnecessary therefore to decide the less important question — whether, if the three members of the Legislature who were employed as attorneys for the highway commission were not members of the Legislature, the highway commission could have employed them as attorneys without the consent or approval of the Attorney General.
 

 The judgment of the district court, granting the writ of injunction in this case, is amended so as to enjoin the highway commission and its members from employing in any capacity, or compensating for any services, the defendant members of the Legislature, so long as they remain in office as members of the Legis
 
 *1069
 
 lature. As thus amended the judgment is affirmed. The case is ordered remanded to the district court for further proceedings consistent with the foregoing opinion.