140 So. 13

**STATE ex rel. CYR et al. v. LONG.**

No. 31587.

Jan. 22, 1932.

Rehearing Denied Feb. 12, 1932.

Frank J. Looney and E. Wayles Browne, both of Shreveport, and Charles T. Wortham, of Donaldsonville, for appellant.

Huey P. Long, of Baton Rouge, J. G. Palmer, of Shreveport, Leander H. Perez, A. D. Danziger, and Harold A. Moise, all of New Orleans, and Robert J. O'Neal, of Shreveport, for appellee.

BRUNOT, J.

This is an intrusion into office suit. It is brought under the provisions of sections 2593, 2594 and 2597 of the Revised Statutes of Louisiana, as amended by Act No. 102 of 1928. The pleadings consist of relator's original and supplemental petitions, to which respondent filed three exceptions and a plea of estoppel. He thereafter pleaded the unconstitutionality of Act No. 102 of 1928.

The issues presented can be briefly stated, but, in this case, we think the pleadings should be quoted in full. The relator's original and supplemental petitions and respondent's exceptions and pleas follow in the order of their filing, viz.:

## Petition.

"To the Honorable, the First Judicial District Court of the State of Louisiana, in and for the Parish of Caddo:

"The State of Louisiana on the relation of Paul N. Cyr, a resident of the Parish of Iberia, and said Paul N. Cyr, who joins the State as Plaintiff herein, present this, their petition, as plaintiffs herein, and for cause of action, against Huey P. Long, a resident of the Parish of Caddo, now made defendant herein, alleges and avers:

"1. That said Paul N. Cyr, was duly elected Lieutenant, Governor of the State of Louisiana at the election held on the Tuesday next following the third Monday in April, in the year 1928, for the ensuing term of four years, beginning according to law.

"2. That on the 21st day of May, 1928, said Paul N. Cyr, took the oath of office as Lieutenant-Governor and entered upon the duties thereof.

"3. That the said Huey P. Long, Defendant herein, was duly elected Governor of the State of Louisiana, at the election held on the Tuesday next following the third Monday in April, in the year 1928, for the ensuing term of four years beginning according to law.

"4. That on the 21st day of May, 1928, said Huey P. Long, took the oath of office as Governor, entered upon the discharge of the functions of Governor, and has been claiming and occupying the said office up to the present day; that the said oath contains the language required to be taken by members of the United States Senate, under the Constitution of the United States, Article VI, Clause III.

"5. That at an election held in the State of Louisiana, on the 4th day of November, 1930, according to law, the said Huey P. Long was elected United States Senator from the State of Louisiana for the term beginning March 4th, 1931, and ending March 3rd, 1937.

"6. That the said Huey P. Long submitted his credentials in regular form as United States Senator from Louisiana for the term of six years, beginning March 4th, 1931, to the United States Senate at the National Capitol at Washington, D. C., and they were received and accepted by the said United States Senate, sitting in regular session, and have ever since remained in the records of the United States Senate.

"7. That by thus actively and voluntarily presenting his credentials to the Senate, the said Huey P. Long, irrevocably accepted the Senatorship of the United States from the State of Louisiana, for the term beginning March 4, 1931, in pursuance of his election as such; and he caused himself to be duly enrolled as Senator from the State of Louisiana for said term.

"8. And in consequence of the foregoing the said Huey P. Long, procured for himself all the prerogatives, privileges and immunities possessed by any and all other Senators of the United States.

"9. That the said Huey P. Long, has received official recognition as Senator from the State of Louisiana for the term beginning March 4th, 1931, and is now recognized as such Senator by the Government of the United States.

"10. That there is now no vacancy in the office of Senator from Louisiana.

"11. That the said Huey P. Long, is entitled to receive his salary monthly from and after March 4th, 1931.

"12. That the said Huey P. Long, has had assigned to him as his office as United States Senator from Louisiana, Room No. 141 in the Senate Office Building at the Capitol at Washington, D. C.

"13. That the said Huey P. Long, has had assigned to him, as Senator of Louisiana, telephone No. 888 on the United States Capital Exchange.

"14. That the said Huey P. Long has done divers other acts which can only be performed by the United States Senator.

"15. That subsequent to the 15th day of October, 1931, and after the said Paul N. Cyr had been inducted into the office of Governor, the said Huey P. Long had procured Alvin O. King, President pro tempore of the Senate of the State of Louisiana, to act under the Constitution of Louisiana, and to assume the functions of Lieutenant-Governor and has publicly acknowledged said King as the person who should act as Lieutenant-Governor upon the accession of the elected Lieutenant-Governor, Paul N. Cyr, to the Governorship of Louisiana, which has been vacated by the election, together with the other acts thereafter of the said Huey P. Long.

"16. That, therefore, the said Huey P. Long, Defendant, is today, and has ever since March 4th, 1931, been a member of the United States Congress.

"17. That the Fourth Section of article 19 of the Constitution of the State of Louisiana forbids any Member of Congress to hold or exercise any office of trust or profit under the State of Louisiana.

"18. That by accepting the office of United States Senator, said Huey P. Long, by that act, forfeited and lost all right to hold the office of Governor of Louisiana.

"19. That although the said Huey P. Long, has been duly elected and has voluntarily accepted the office of United States Senator and gone into possession of same, and by that act forfeited and vacated the office of Governor of Louisiana, said Huey P. Long, continues to unlawfully hold and exercise, and to remain in possession of the office of Governor of the State of Louisiana.

"20. That on the 13th day of October, 1931, said Paul N. Cyr, on being advised that he was of right Governor of Louisiana, took the oath of office as such before the Deputy Clerk of the First Judicial District Court, in and for the Parish of Caddo; and in due course deposited the said oath for filing in the office of the Secretary of State of Louisiana.

"21. That on the 13th day of October, 1931, the said Paul N. Cyr advised the said Huey P. Long in writing that he had taken the oath of office as Governor of Louisiana, and had been inducted into said office; and made demand upon the said Huey P. Long that the said Huey P. Long immediately surrendered the office of Governor, together with its archives and all that pertain to such office, and divest himself of the appearance of Governor of Louisiana.

"22. That on Wednesday, October 14th, 1931, the said Huey P. Long, in a written reply to said Paul N. Cyr, declined in toto to accede to the demands of the said Paul N. Cyr.

"23. Plaintiffs further aver that from the date the said Huey P. Long was informed, as aforesaid, that Plaintiff, Paul N. Cyr, had qualified as Governor of Louisiana, and received the demand of said Paul N. Cyr, for the said office of Governor, the **said Huey P.** Long has held the said office of Governor in bad faith.

"24. That the salary, fees and emoluments appertaining to the office of Governor from the 13th day of October, 1931, until he shall vacate the office of Governor of Louisiana, are justly and truly the property of Plaintiff, Paul N. Cyr, and said Huey P. Long should be condemned to pay over to said Paul N. Cyr, such fees and emoluments as he has drawn appertaining to the period beginning October 13th, 1931, to the time of his vacating the said office.

"Wherefore, Plaintiffs pray that the said Defendant, Huey P. Long, be duly cited to appear and answer this petition, and after legal delays and due proceedings had, judgment be rendered in favor of Plaintiffs, and against the said Huey P. Long, ordering the said Huey P. Long to immediately vacate the said office of Governor of Louisiana, and to deliver the same to the said Paul N. Cyr; and that he be further condemned to deliver to said Paul N. Cyr, all property of the State of Louisiana, and all books and papers in his possession appertaining to the office of Governor of Louisiana.

"And plaintiffs further pray that if the said Huey P. Long should refuse to comply with the judgment of this Court, that he be ejected from the said office in the manner provided by law.

"Plaintiffs further pray that the said Huey P. Long, be ordered to pay over to the said Paul N. Cyr, all salary which he shall have drawn as Governor of the State of Louisiana, pertaining to the period which shall have elapsed from the 13th day of October, 1931, up to the time he vacates and delivers the said office.

"And Plaintiffs pray for costs and for necessary orders and for general and equitable relief in the premises."

Supplemental and Amended Petition.

"Now into Court come the State of Louisiana, on the relation of Paul N. Cyr, a resident of the Parish of Iberia, and said Paul N. Cyr, who joins the State as Plaintiff herein, and adopting all of the allegations and prayer of the original petition herein, present this, their supplemental and amended petition as plaintiffs herein, and for additional cause of action, against Huey P. Long, a resident of the Parish of Caddo, made defendant herein, allege and aver:

"I. That they are informed and believe, and so aver, that the said Huey P. Long, has in writing made demand on George H. Moses, Senator from New Hampshire and Chairman in charge of the Senate Office Building, requesting ample accommodations in the way of rooms for himself and his law library of three thousand volumes.

"II. That they are informed and believe, and so aver, that the said Huey P. Long, has caused the public printer, by virtue of being United States Senator, to have printed for him letter heads under the title of United States Senator, and has paid for same.

"III. That they are informed and believe, and so aver, that the said Huey P. Long, has further availed himself of his functions and prerogatives as a United States Senator by voluntarily requesting from the Department the distribution of the Agricultural Year Book for the year 1931, to certain of his constituents who had requested copies of same; said Year Book being distributed only through the Members of Congress and each United States Senator being entitled to distribute a certain number of copies of same.

"Wherefore, premises considered, petitioners reiterate the prayer of their original petition filed herein; pray for service and citation hereof on said defendant, and pray further that this supplemental and amended petition be filed and allowed.

"Pray for all orders and decrees necessary, and for full and equitable relief in the premises."

Exceptions and Plea of Estoppel.

"Now into this Honorable Court comes the defendant, and excepts to the petitions and suit filed herein, and shows that the same should be dismissed for the following causes and reasons to-wit:

"I. The Court is without jurisdiction ratione materiae herein.

"II. The petitions and suit filed herein by the plaintiffs do not allege or set forth a cause of action.

"III. The petitions and suit filed herein by the plaintiffs do not allege or disclose a right of action on the part of said plaintiffs.

"IV. The said plaintiff Paul N. Cyr, is estopped in equity and in law from bringing or prosecuting this suit or from standing in judgment herein.

"Wherefore, your defendant respectfully prays that these exceptions be sustained and that the plaintiffs' suit be dismissed at their cost.

"He prays for all and general relief and for judgment according to law."

Amendment and Supplement to Exceptions.

"Now into this Honorable Court comes the defendant, Huey P. Long, and adds this as his amendment and supplement to the exceptions heretofore filed in this case, to-wit:

"V. That Act 102 of the Regular Session of the Legislature of the State of Louisiana of the year 1928, is unconstitutional insofar as the same purports to empower the said plaintiffs to file this suit and to prosecute the same, and insofar as the same purports to give this Court jurisdiction of a suit against defendant for the purpose of removing and ousting him from the office of Governor of the State of Louisiana, the same being contrary to and violative of the following provisions of the Constitution of the State of Louisiana, to-wit: Sections 1, 2, 3, 4, 5, 6 and 9 of Article IX of the Constitution of the State of Louisiana; that the provisions as made by the said Constitution of the State of Louisiana for the method and manner of bringing suit for the removal of one claiming an office and for the removal of one holding the office of Governor are exclusive, and legislative provisions in addition thereto, not within the scope of the provisions of the Constitution, are invalid as violative of said Constitution.

"Wherefore, defendant respectfully prays that this supplement and amendment to the exceptions filed herein may be filed and allowed; that the exceptions, including this supplement and amendment, heretofore filed be sustained by the Court; for all and general relief and judgment according to law."

The case was heard upon the issues thus presented. The court below overruled the respondent's exceptions to the jurisdiction of the court, of no right of action, his plea of estoppel and of the unconstitutionality of Act No. 102 of 1928, but maintained his exception of no cause of action and dismissed the suit.

Relator appealed from the judgment and contends here that the district judge erred in maintaining respondent's exception of no cause of action; that the ruling upon the exception should be reversed and the case should be remanded for the joining of issue upon the allegations of relator's original and supplemental petitions and the trial of the case upon the merits.

The respondent has answered the appeal and prays that the judgment appealed from be reversed in so far as it overrules respondent's exceptions to the jurisdiction of the court and of no right of action and his plea of estoppel, but, in all other respects, that it be affirmed. It will be noted that in respondent's answer to the appeal there is no reference to the lower court's ruling upon his pleaded unconstitutionality of Act No. 102 of 1928.

The first question to be considered is respondent's exception to the jurisdiction of the court ratione materiæ. If that exception be well founded, the court is powerless to pass upon any other issue presented. Both in argument and brief relator exhaustively recites the historical facts and contemporaneous interpretations thereof, which immediately preceded or were coincidental with the adoption of the Constitution of the United States and the organization of the first Congress thereunder. This recital is interesting and, to some extent, instructive, but it is not helpful to the court in deciding whether or not it may substitute its judgment for that of the Senate in determining when and under what circumstances one, who has been elected a United States Senator, actually becomes a member of that body, clothed with the powers and charged with the performance of the duties pertaining to that office.

Relator concedes that section 5 of article 1 of the Constitution of the United States is exclusive and, therefore, each House of Congress is the sole judge, respectively, of the elections, returns, and qualifications of its members. 39 Cyc. p. 696. The courts must take judicial notice of the Congressional Record. 23 C. J. p. 102. It is true, as alleged in relator's petition, that the respondent has forwarded his credentials to the Senate, but it is not true that they have been accepted by that body. By reference to the Congressional Record, vol. 74, No. 1, 71st Congress, 3d Session, p. 292, and vol. 74, No. 3, 71st Congress, 3d Session, p. 2576, the credentials of respondent were read and placed on file, and the credentials presented for all Senators were printed in full. The Senate, therefore, has not formally accepted respondent's credentials, and his right to qualify, in the manner prescribed by rule II of the United States Senate, and to function, as a member of that body, remains to be definitely determined by

the Senate, the sole judge thereof, sitting in a judicial capacity, and passing upon an unmixed federal question.

The several other enumerated acts alleged in relator's original and supplemental petitions, as being persuasive of respondent's irrevocable acceptance of the office of United States Senator, do not impress us. They are the customary courtesies extended by the Senate to a Senator-elect, in anticipation of his formally qualifying and actually exercising the powers and performing the duties pertaining to the members of that body.

The relator's suit is brought under the provisions of penal laws. Sections 2593, 2594, and 2597 of the Revised Statutes as amended by Act No. 102 of 1928, prescribe penalties for their violation. It must be noted, in this connection, that Act No. 123 of 1921 also prescribes penalties for dual office holding. If it were true that the Governor of this state had been prosecuted and convicted, or had pleaded guilty, to the charge or charges of committing any one, or all, of the misdemeanors denounced by the laws relator relies upon, would such a conviction give this court jurisdiction to entertain a suit for his removal from office?

The relator alleges that respondent was duly elected Governor of this state; that he qualified as Governor by taking the prescribed oath of office; that since his induction into that office he has retained possession of it and has continuously exercised the powers of the office; and that the term of said office has not expired. In this suit it is necessary that relator allege such facts, but had he omitted to allege them, the court must, perforce, take judicial cognizance of them. The court must

also take judicial cognizance of the fact that since respondent's induction into the office of Governor of Louisiana, he has been recognized and dealt with as the chief executive of the state by the national government, by every department, board, etc., of the state of Louisiana, by the citizenry of the state and by the relator himself, from the date of his induction into office as Lieutenant Governor of Louisiana, until October 13, 1931, more than eight months after March 4, 1931, on which latter date the relator now contends that respondent actually became a United States Senator, and since that date has been a usurper of the office of Governor of Louisiana and a dual office holder.

Being the duly elected, formally qualified, and recognized Governor of Louisiana, and not yet having been recognized as a Senator, and inducted into that office, it is not legally possible for any court, if it was vested with jurisdiction, to hold that respondent was a usurper or intruder into the office of Governor of Louisiana, or that he is presently a dual office holder. If he was, in fact, an intruder into office and a dual office holder, the Constitution of the state prescribes the exclusive method by which he may be removed from the office of Governor.

Article 9 of the Constitution of 1921 fixes the exclusive forum for the removal from office of all officers of the state, district, parish, ward, or municipality. We quote the pertinent parts of the first six sections of article 9.

"Section 1. All state and district officers, whether elected or appointed, shall be liable to impeachment for high crimes and misdemeanors in office, incompetency, corruption,

favoritism, extortion, or oppression in office, or for gross misconduct, or habitual drunkenness.

"Sec. 2. All impeachments shall be by the House of Representatives, and shall be tried by the Senate, whose members shall be upon oath or affirmation for that purpose, and two-thirds of the senators elected shall be necessary to convict.

"Sec. 3. For any reasonable cause, whether sufficient for impeachment or not, any officer, except the Governor or acting Governor, on the address of two-thirds of the members elected to each house of the Legislature, shall thereby be removed, and be ineligible to succeed himself.

"Sec. 4. For any of the causes mentioned in Section 1 hereof, judges of the Supreme Court may be removed from office by judgment of a court of not less than seven judges, to be composed of the judges of the Supreme Court not connected with the case and a sufficient number of the judges of the courts of appeal, oldest in point of service.

"Sec. 5. For any of the causes specified in Section 1 hereof, the judges of the courts of record may be removed by judgment of the Supreme Court, which is hereby vested with original jurisdiction therein, and may make such rules for the speedy and economical trial thereof as it deems proper.

"Sec. 6. For any of the causes enumerated in Section 1 hereof, any officer, whether state, district, parochial, or of a ward or municipality, except the Governor, Lieutenant-Governor, and judges of the courts of record, may be removed by judgment of the district court of his domicile."

It is clear that the Constitution of 1921 confers upon the Legislature the exclusive power to remove a Governor from office, and it prescribes but one procedure by which that end may be attained, viz., by impeachment.

Section 3 of article 9 of the Constitution excepts the Governor and acting Governor from the effect of its provisions; section 4 relates only to judges of the Supreme Court; section 5 relates to judges of courts of record; and section 6 excepts the Governor, Lieutenant Governor, and judges of the courts of record from its provisions.

Articles 106 of the Constitution of 1868, 201 of the Constitution of 1879, 222 of the Constitution of 1898, 222 of the Constitution of 1913, and article 9 of the Constitution of 1921 provide the same methods for the removal of a constitutional officer. This court has applied these provisions in a strictly literal sense.

In the case of State v. Dunson, 138 La. 131, 70 So. 61, 62, the court adopted the opinion of Judge Bell as its own, and held as follows:

"If the Constitution provides the method for the removal of justices of the peace, constitutional officers, then that method is exclusive. State ex rel. Young v. Capdevielle, 135 La. 669, 65 So. 890, on rehearing. Article 222 of the Constitution of 1913 provides the methods for removal of a justice of the peace who has been guilty of a misdemeanor, etc., and he can be removed in no other way.

The same principle is announced in other decisions of this court, and, until the present time, it stands unquestioned, without modification, as the jurisprudence of this state.

Relator cites the following cases, viz.: Marbury v. Madison, 1 Cranch, 137, 161, 162, 2 L. Ed. 60; Ableman v. Booth, 21 How. 506, 16

L. Ed. 169; Barry v. U. S. ex rel. Cunningham, 279 U. S. 597–615, 49 S. Ct. 452, 73 L. Ed. 867; Woodson v. Murdock, 22 Wall. 369, 22 L. Ed. 716; Rhode Island v. Massachusetts, 12 Pet. 721, 9 L. Ed. 1233; Cohens v. Virginia, 6 Wheat. 384, 5 L. Ed. 257; Johnson v. Atlantic G. & W. I. Transit Co., 156 U. S. 618, 15 S. Ct. 520, 39 L. Ed. 556; Page v. U. S., 127 U. S. 67, 8 S. Ct. 1026, 32 L. Ed. 65; Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Burton v. United States, 202 U. S. 344, 26 S. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362; State ex rel. Gray v. Pipes, 17 La. App. 502, 133 So. 812; two Louisiana cases on the question of estoppel, and nine Louisiana cases holding that the possession and occupancy of two incompatible offices violates the Constitution of Louisiana.

In not a single one of the cited cases—nor in a single case in the books except the ancient case of Attorney General ex rel. Bashford v. Barstow, 4 Wis. 567—where a Governor was actually in office, was he disturbed by the courts.

Moreover, in no case cited by relator was the jurisdiction of the court ratione materiæ an issue. A mere reading of the cited cases will demonstrate that they are not even persuasively helpful to the court in deciding the issue we are considering. The same may be said of relator's references to and quotations from Elliott's Debates, Warren's Making of the Constitution, and the Senate Journal.

It would be vain and useless, at this time, to seriously consider any citation that does not pertain to the issue before us.

For the foregoing reasons we are convinced that respondent's exception to the jurisdiction of the court ratione materiæ is sound in law and must be maintained. Being without jurisdiction, the court is powerless to pass upon any other question presented by the pleadings.

It is therefore decreed that the judgment appealed from be and it is reversed; that respondent's exception to the jurisdiction of the court ratione materiæ is maintained; and this suit is dismissed, at relator's cost in both courts.

O'NIELL, C. J., and ROGERS and ODOM, JJ., are of the opinion that the court has jurisdiction to decide this case.

OVERTON, LAND, and ST. PAUL, JJ., concur in the decree for the reasons assigned by ST. PAUL, J.

ST. PAUL, J. (concurring).

I concur in the decree herein handed down, and I place my concurrence squarely on the proposition that neither this court, nor any other court, has jurisdiction to determine who is the Governor of the state of Louisiana. Courts take judicial cognizance of who is the Governor of the state and do not examine that question as a judicial one. This court has no more authority to inquire into the title of Huey P. Long, present incumbent, than would a court of the United States be authorized to inquire into the title of Herbert Hoover to the office of President of the United States.

Through the courtesy of the American Law Book Company of Brooklyn, N. Y., Lawyers Co-operative Publishing Company of Rochester, New York, and West Publishing Company of St. Paul, Minn., and through researches made by myself, I have been able to gather what seem to be all the authorities that bear

directly or indirectly upon the question presented in this case. However, I have made no mention of such cases as relate only to mandamus proceedings directed to a Governor to perform some purely ministerial act, and in which, as a rule, the Governor has no interest whatsoever, and where the question of jurisdiction in the premises has either not been raised at all, or raised only in a perfunctory manner. I will not undertake to analyze all these cases, but for the benefit of any one who feels interested in the matter I here list them: Baxter v. Brooks, 29 Ark. 173; State v. Baxter, 28 Ark. 129; Dickson v. Strickland, 114 Tex. 176, 265 S. W. 1012; In re Senate Resolution No. 10, 33 Colo. 307, 79 P. 1009; State v. Bulkeley, 61 Conn. 287, 23 A. 186, 14 L. R. A. 657; In re Moore, 4 Wyo. 98, 31 P. 980; Goff v. Wilson, 32 W. Va. 393, 9 S. E. 26, 3 L. R. A. 98; Carr v. Wilson, 32 W. Va. 419, 9 S. E. 31, 3 L. R. A. 64; State ex rel. Thayer v. Boyd, 31 Neb. 682, 48 N. W. 739, 51 N. W. 602; Ex parte Norris, 8 S. C. 408; Ex parte Smith, 8 S. C. 495; Taylor v. Beckham, 178 U. S. 548, 20 S. Ct. 890, 1009, 44 L. Ed. 1187; Boyd v. Nebraska, 143 U. S. 135, 12 S. Ct. 375, 36 L. Ed. 103; State v. Favre, 51 La. Ann. 434, 25 So. 93; Taylor v. Beckham, 108 Ky. 278, 56 S. W. 177, 49 L. R. A. 259, 94 Am. St. Rep. 357; Attorney General ex rel. Bashford v. Barstow, 4 Wis. 567, 758, 759; Mississippi v. Johnson, 4 Wall. 475, 18 L. Ed. 437; Georgia v. Stanton, 6 Wall. 50, 18 L. Ed. 721; Luther v. Borden, 7 How. 1, 12 L. Ed. 581; Saint v. Allen, 169 La. 1046, 126 So. 548; Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078; Reid v. Brunot, 153 La. 490, 96 So. 43. See, also, State ex rel. Morgan v. Kennard, 25 La. Ann. 238, 244; Kennard v. Louisiana, 92 U. S. 480, 23 L. Ed. 478.

# I.

From the foregoing it will be found that the courts are much divided as to the right of the judiciary, under pretext of quo warranto proceedings, to undertake in effect to designate the Governor of the state.

The first case in which that question arose was the Wisconsin governorship case, reported in 4 Wis. 567 to 802 as Attorney General ex rel. Bashford v. Barstow. Bashford and Barstow were opposing candidates for the governorship; on the face of the returns Barstow was elected by a plurality of less than two hundred votes. Barstow and Bashford both took the oath of office, but Barstow was the first to get possession. Whereupon Bashford brought quo warranto proceedings before the Supreme Court of the state to contest the title of Barstow; that is to say, to oust Barstow and be himself placed in possession of the office. The court decided that it had jurisdiction and proceeded with the case. Barstow, in a communication to the court which appears at pages 758 and 759 of the report, notified the court that he would not acknowledge its jurisdiction, would not recognize its decree, and would resist with the full force of his office any attempt to enforce a decree of the court against him. The court, however, proceeded with the case and entered a decree ousting Barstow and seating Bashford.

So far as the law reports go this case ends unsatisfactorily, because it does not tell us the sequel. But through the courtesy of Mr. Stephen A. Mascaro, the librarian of the Louisiana State Bar Association, I have been furnished with a copy of the report of the Proceedings of the Wisconsin State Bar Asso-

ciation, volume 1, years 1878 to 1885, in which I find an epitome of the life of Coles Bashford, at page 258, from which I extract the following:

"In 1852 he was elected to the state senate from the 21st district, embracing the county of Winnebago, and in 1854, was re-elected from the same district, and served during the sessions of 1853, 1854 and 1855. Having been nominated by the then new Republican Party, in 1855, he resigned his seat in the senate. Wm. A. Barstow, who had held the office during the preceding term, was the Democratic candidate against Mr. Bashford. According to the official canvass Gov. Barstow had a majority of 157. He received the certificate of election and entered upon the duties of the office. It was alleged, by Mr. Bashford and his friends, that false and fraudulent returns had been made to the state canvassers, and canvassed by them. A quo warranto was brought in the name of the Attorney General, upon the relation of Mr. Bashford, in the supreme court. The court "went behind the returns" and made a new canvass, deciding that Mr. Bashford had received a majority of the legal votes and was entitled to the office. By virtue of this decision he entered upon the duties of the office on the 25th of March, 1856, and he held it until January 4, 1858."

This was a most fortunate solution of a question capable of exceeding vexation to many. It seems that Mr. Barstow was more promising in words than in performance. But the matter might have ended differently.

For instance, in Ex parte Norris, 8 S. C. 408, and Ex parte Smith, 8 S. C. 495, the Supreme Court of South Carolina was asked to pass upon the title to the governorship of that state by proceedings for habeas corpus on behalf of certain persons pardoned by two different individuals each claiming to be Governor of South Carolina. The actual incumbent was the handsome and courtly, but brave and determined, Wade Hampton, late Brig. General, C. S. A., who had taken his seat as Governor of the state in the face of federal bayonets. The court solved the question in favor of Hampton, but had the question been solved otherwise, is there any one so simple as to believe that General Hampton would have surrendered his office, thus held even against the armed federal forces, at the say-so of a few theorists powerless to make their decree effective? If such there be, he also doubtless believes in Santa Claus and the fairies.

In State v. Baxter, 28 Ark. 129, and Baxter v. Brooks, 29 Ark. 173, the Supreme Court of Arkansas was asked to pass on the title to the office of Governor of the state of Arkansas between two individuals each claiming to have been elected; one of these cases was a quo warranto proceeding; the other a civil suit for salary; one was decided by a Supreme Court composed of five judges, the other by a Supreme Court composed of three judges. How this change of courts occurred, does not appear from the reports. Possibly it occurred in the same way as the change of courts occurred in this state about the same time, when the Supreme Court presided over by Ludeling, C. J., was displaced by the Supreme Court presided over by Manning, C. J. The bar, the people, and the new Nicholls government, which had just taken possession and control of the state, all recognized the Manning Court, and the Ludeling Court

merely faded out of existence. But we see from the report in Baxter v. Brooks, 29 Ark. 173, that the whole matter was effectively settled, not by the decision of the Supreme Court of Arkansas, nor even by that of its two Supreme Courts, but by the fact that the President of the United States, on the advice of his Attorney General, recognized the incumbent Baxter, who was thus effectively maintained in his office. In each of these two cases the Supreme Court of Arkansas declined jurisdiction. In the quo warranto proceedings, because they said it would be an interference by the judiciary with the executive department of the state; and in the salary proceeding, because the question of salary depended upon the title to the office and the same reasoning applied.

In Dickson v. Strickland, 114 Tex. 176, 265 S. W. 1012, the Supreme Court of Texas declined to pass upon the qualifications of Mrs. Ferguson as a candidate for Governor, on the ground that the sole judge of the qualifications of a gubernatorial candidate was the joint legislative assembly; that the judiciary had no jurisdiction in the premises. It was urged in that case that the Supreme Court had answered some questions put to it by the Texas Court of Civil Appeals, and therefore had entertained jurisdiction; to which the Supreme Court replied that it had only answered the questions put to it by the Civil Court of Appeals, and no question had been asked them touching jurisdiction; but that in any event the case before the Civil Court of Appeals involved a party nomination and not a candidacy before the people.

In Taylor v. Beckham, 108 Ky. 278, 56 S. W. 177, 49 L. R. A. 259, 94 Am. St. Rep. 357, the Supreme Court of Kentucky was asked to pass upon the title to the governorship of Kentucky, claimed by two individuals. The court entertained jurisdiction but finally decided that the count made by the General Assembly of the people was conclusive, although the evidence showed that the election reeked with frauds. The case was carried to the Supreme Court of the United States and, as it involved no federal question that court declined to interfere. 178 U. S. 548, 20 S. Ct. 890, 1009, 44 L. Ed. 1187.

In State v. Bulkeley, 61 Conn. 287, 23 A. 186, 14 L. R. A. 657, the Supreme Court of Connecticut entertained jurisdiction in a controversy involving the governorship of Connecticut. The General Assembly had failed or refused to count the votes. Quo warranto proceedings were begun in some inferior court against the holdover Governor by one claiming to have been elected. The court decided that as the General Assembly would not do its duty or had lost power in the premises by lapse of time, the court itself would proceed to canvass the returns and declare the result; and then, perceiving that the relator had declared merely that upon the face of the returns he appeared to have been elected, but had not declared that in fact he had been elected, held that the quo warranto proceedings should have been dismissed with leave to the relator to renew his suit upon proper allegations.

State ex rel. Thayer v. Boyd, 31 Neb. 682, 48 N. W. 739, 51 N. W. 602, and Boyd v. Nebraska, 143 U. S. 135, 12 S. Ct. 375, 389, 36 L. Ed. 103, involved the governorship of Nebraska. Thayer was Governor of the state and Boyd was elected to succeed him. Boyd took his oath of office and went into possession. Some months afterwards Thayer conceived

the idea that he had improvidently surrendered the governorship to Boyd, alleging that Boyd was not qualified to hold the office because he (Boyd) was not a citizen of the United States; and Boyd being in possession, Thayer brought quo warranto proceedings against him before the Supreme Court of Nebraska. That court entertained jurisdiction and decided that Boyd was not a citizen of the United States and therefore not qualified to hold the office of Governor of Nebraska. Thereupon the court entered judgment ousting Boyd and restoring Thayer to the governorship, as one entitled to hold the office until his successor was duly qualified. But the case did not end there, as one would have supposed it might have ended; no one dreamed that the Supreme Court of the United States would take a hand in a matter so purely local. But in this they were mistaken. The Supreme Court of the United States did entertain jurisdiction. It held that since the matter was before the courts, it was "a case" within the meaning of the Constitution of the United States, a case manifestly involving a federal question, and decided by a court of last resort. Whereupon that august tribunal promptly decided that Boyd was a citizen of the United States, overruled and reversed the decision of the Supreme Court of Nebraska, and adjudged the office to Boyd.

The decree of the Supreme Court of the United States reads as follows: "The judgment of the supreme court of Nebraska is reversed, and the cause remanded to be proceeded in according to law and in conformity with this opinion."

The dissenting opinion of Mr. Justice Field in that case is illuminating but not consoling.

It shows, as the Supreme Court of Arkansas had previously shown, that if a state court and a federal court can name a Governor, they can also name the members of the Legislature. And thus the whole power of government can be gathered into the hands of the judiciary department to the exclusion of both the legislative and executive departments. This not only by a state court but by a federal court, and a state may be governed, if need be, by a federal marshal. Cf. Kennard v. Louisiana, 92 U. S. 480, 23 L. Ed. 478.

This state has already experienced government by federal marshals, or rather by federal soldiers. In 1872, the people of this state elected John McEnery and Davidson B. Penn, respectively, Governor and Lieutenant Governor of this state, but William Pitt Kellogg and C. C. Antoine also claimed those offices; and the history of the times tells us that President Grant, with his federal troops, sustained Kellogg and his negro Lieutenant-Governor. At the foot of Canal street in the city of New Orleans stands a monument dedicated to the memory of the fourteen white leaguers who paid with their lives the penalty of resisting this hydrid government.

In this case a federal question is involved, namely, when does a Senator-elect become a Senator in fact of the United States? Whatever this court might decide on that question, the Supreme Court of the United States, under the authority and precedent of Boyd v. Nebraska, 143 U. S. 135, 12 S. Ct. 375, 36 L. Ed. 103, will undoubtedly entertain jurisdiction upon proper application by the party feeling aggrieved; and again the Governor of this state will be named not by the people of the state but by federal authority prepared to enforce its mandate, and, if need be, gov-

ern this state through a United States marshal.

In Saint v. Allen, 169 La. 1046, 126 So. 548, this court delivered an elaborate opinion on the subject of keeping separate the different departments of government, and so supersensitive did the court feel on that subject that it promptly threw out of the highway department sundry small attorneys employed by that department, because, forsooth, they were members of the legislative department of the state, to wit, Senators and Representatives.

If this court were now to inject itself into a controversy over the governorship of the state of Louisiana, it seems to me that it would now be swallowing a camel where heretofore it had strained at a gnat.

There are some questions in government which are purely political and with which courts have nothing whatever to do and in which they should refrain from interfering. They should recognize the President of the United States and not inquire into his title to office. They should recognize the Governor of the state and not inquire into his title to office. They should recognize the Congress of the United States and not inquire into the title of the Senators and Representatives who sit in that august body. They should recognize the Legislature of the state and not inquire into the title of the members who compose that assembly. They should recognize the Constitution of the state and not inquire into its validity. They have no power to interfere with Presidents and Governors and Congress and the Legislature in the discharge of their duties and no warrant whatsoever to interfere with their incumbency. State v. Favre, 51 La. Ann. 434, 25 So. 93; Luther v.

Borden, 7 How. 1, 12 L. Ed. 581; Mississippi v. Johnson, 4 Wall. 475, 18 L. Ed. 437; Georgia v. Stanton, 6 Wall. 50, 18 L. Ed. 721; Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078; Reid v. Brunot, 153 La. 490, 96 So. 43; State ex rel. Morgan v. Kennard, 25 La. Ann. 238, 244.

I here mention the principal cases and events bearing on the subject under consideration. The other cases noted at the beginning, but not specially referred to, are not particularly enlightening. But it is my deliberate conclusion that the law warrants and every material and moral interest of the state demand, that its courts should confine themselves to the business for which they were established and keep their hands out of matters which do not concern them.

## II.

Thus far I have dealt with the question only on general principles of law and government. But in this state our Constitution of 1921 has itself spoken on the subject. Article 8, § 12, p. 74, of that instrument reads as follows:

"The Legislature shall provide by law for the trial and determination of contested elections of all public officers, whether State, district, judicial, parochial, municipal or ward (except Governor and Lieutenant Governor), which trials shall be by the courts of law, and at the domicile of the party defendant."

Clearly here the Legislature is forbidden to provide for trials before the courts of contested elections for Governor and Lieutenant Governor. And if it be true, and it is true, as held in Reid v. Brunot, 153 La. 490 (syllabus 1), 96 So. 43, that:

"All elections and all matters relating to or affecting them belong to political departments of the government, and are beyond control of the judicial power, in absence of special constitutional or statutory authorization."

Then it follows that the courts of the state cannot entertain any contested election case involving the Governor or Lieutenant Governor.

For, under Reid v. Brunot, supra, they cannot entertain such contests without statutory authorization, and under the Constitution the Legislature cannot give them such authorization.

Therefore if this were a contested election matter, the courts could not entertain it.

But if it is not a contested election matter, then it is clearly a matter of "removal from office." Here again, under article 9, § 6, p. 79, of the Constitution, the courts are given power to remove "any officer, whether state, district, parochial, or of a ward or municipality, *except the Governor and Lieutenant-Governor.*" But if the courts cannot *remove* a Governor or Lieutenant Governor, then the case cannot be entertained.

It is perfectly manifest that the Constitution intended to make effective (against the grasping tendency of the judiciary department to draw to itself power and jurisdiction on all occasions) that part of the Constitution which declares, article 2, § 1, p. 3, that:

"The powers of the government of the State of Louisiana shall be divided into three distinct departments." Vide Saint v. Allen, supra.

## III.

This concurring opinion has been hurriedly dictated, contrary to my usual practice of writing my opinions in my own hand, and hence has neither the sequence, clarity, nor brevity with which I endeavor to clothe my opinions generally. I have neither the time nor the inclination to write concurring and dissenting opinions, but the importance of the matter now before the court is such that I deem it well to hand this down so as to serve rather as a repository of the authorities which I have gathered bearing on the question than as the finished product which I usually try to furnish as a result of my labors.

I therefore concur.